Justin T. Beck (Cal. Bar. No. 53138)
Alfredo A. Bismonte (Cal. Bar. No. 136154)
Ron C. Finley (Cal. Bar. No. 200549)
Jeremy M. Duggan (Cal. Bar. No. 229854)
BECK, ROSS, BISMONTE & FINLEY, LLP
50 West San Fernando Street, Suite 1300
San Jose, California 95113
Tel: (408) 938-7900
Fax: (408) 938-0790
Email: jbeck@beckross.com
        rfinley@beckross.com
        abismonte@beckross.com
        jduggan@beckross.com


Wesley W. Whitmyer, Jr.
David W. Aldrich
Christopher H. Strate
Walter B. Welsh
ST. ONGE STEWARD JOHNSTON & REENS LLC
986 Bedford Street
Stamford, Connecticut 06905
Tel: (203) 324-6155
Fax: (203) 327-1096
Email: wwhitmyer@ssjr.com
        daldrich@ssjr.com
        cstrate@ssjr.com
        wwelsh@ssjr.com

Attorneys for Plaintiff, Karl Storz
Endoscopy-America, Inc.:

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| | **Case No. C 09-0355 (VRW)** |
| KARL STORZ ENDOSCOPY-AMERICA, INC. | **PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF** |
| Plaintiff, | |
| v. | Hon. Vaughn R. Walker |
| STRYKER CORPORATION, AND STRYKER COMMUNICATIONS, INC. | |
| Defendants. | |

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

1
2

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES ........................................................................................iv

TABLE OF APPENDICES ...........................................................................................vi

TABLE OF DISPUTED CLAIM TERMS ....................................................................ix

      U.S. Patent No. 5,788,688.............................................................................xi

      U.S. Patent No. 6,397,286............................................................................ xii

      U.S. Patent No. 6,824,539...........................................................................xiv

MEMORANDUM .........................................................................................................1

I.     INTRODUCTION ...............................................................................................1

II.    GENERALLY APPLICABLE LAW ................................................................. 2

III.   THE '688 PATENT CLAIM TERMS ................................................................4

    A.    The '688 Patent ..................................................................................... 4

    B.    The Disputed Claim Terms of the '688 Patent...................................5

        1.    "a surgeon's operating station at which a surgical
             procedure is performed" ..................................................5

        2.    "a surgeon's control panel operatively positioned at the
             surgeon's operating station"...........................................7

        3.    "whereby each of the plurality of self-contained pieces
             of surgical equipment can be simultaneously operated
             with the operation thereof controlled and monitored from
             the surgeon's operating station" ......................................9

    C.    Disputed Means-Plus-Function Claim Terms ...............................15

        1.    Construction of 35 U.S.C. § 112, Sixth Paragraph, Claim Terms .....15

        2.    "display means" ...................................................................17

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

3.    "input means"...............................................................................19

IV.    THE '286 PATENT CLAIM TERMS.....................................................21

    A.    The '286 Patent .........................................................................21

    B.    The Disputed Claim Terms of the '286 Patent.............................23

        1.    "self-configuring bus"..................................................23

        2.    "whenever a said instrument is either newly connected
            or is disconnected from said bus without interruption
            of the operation of the system" .......................................25

V.    THE '539 PATENT CLAIM TERMS .....................................................27

    A.    The '539 Patent .........................................................................27

    B.    The Disputed Claim Terms of the '539 Patent.............................28

        1.    "remotely controllable surgical device"...........................28

        2.    "interface, connected between the touchscreen controller
            and the first remotely controllable surgical device and the
            second remotely controllable surgical device, for converting
            the controller command protocol to the first and second
            command protocols, and for transforming inputs received by
            the touchscreen into commands for controlling the first and
            second remotely controllable surgical devices"

            or

            "interface" .......................................................................29

        3.    "wherein said first remotely controllable surgical is a first
            party device and said second remotely controllable surgical
            device is a third party device, the second command protocol
            being different from the first command protocol"...........................33

VI.    CONCLUSION .........................................................................................34

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

# TABLE OF AUTHORITIES

Cases

*Altiris, Inc. v. Symantec Corp.*,
    318 F.3d 1363 (Fed. Cir. 2003)....................................................................................2

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*,
    262 F.3d 1258 (Fed. Cir. 2001)....................................................................................2

*Budde v. Harley-Davidson, Inc.*,
    250 F.3d 1369 (Fed. Cir. 2001)....................................................................................17

*Callicrate v. Wadsworth Mfg., Inc.*,
    427 F.3d 1361 (Fed. Cir. 2005)..............................................................................16,20

*CCS Fitness, Inc. v. Brunswick Corp.*,
    288 F.3d 1359 (Fed. Cir. 2002) ...................................................................................2

*Clearstream Wastewater Sys. Inc. v. Hydro-Action Inc.*,
    206 F.3d 1440 (Fed. Cir. 2000)...................................................................................16

*Cybor Corp. v. FAS Tech., Inc.*,
    138 F.3d 1448 (Fed. Cir. 1998)...................................................................................17

*Data General Corp. v. I.B.M. Corp.*, 93 F. Supp.2d 89, 94 (D. Mass. 2000)
    93 F. Supp.2d 89 (D. Mass. 2000) ..........................................................................2, 12

*Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*,
    383 F.3d 1352 (Fed. Cir. 2004)..............................................................................2, 12

*Golight, Inc. v. Wal-Mart Stores, Inc.*,
    355 F.3d 1327 (Fed. Cir. 2004).............................................................................passim

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys. Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004)....................................................................................3

*Intel Corp. v. VIA Techs., Inc.*, .,
    319 F.3d 1357 (Fed. Cir. 2003)..............................................................................17, 18

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
    175 F.3d 985 (Fed. Cir. 1999).....................................................................................28

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
    424 F.3d 1324 (Fed. Cir. 2005)...................................................................................15

*Liebel-Flasheim Co. v. Medrad Inc.*,

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

358 F.3d 898 (Fed. Cir. 2004), *cert. denied*, 543 U.S. 925 (2004)............................3

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996) ...........................................................................................1

*McCarty v. Lehigh Val. R.R.*, 160 U.S. 110, 116 (1895)
    160 U.S. 110 (1895).........................................................................................28

*Medical Instrumentation & Diagnostics Corp. v. Elekta AB*,
    344 F.3d 1205 (Fed. Cir. 2003).................................................................passim

*Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*,
    194 F.3d 1250 (Fed. Cir. 1999)......................................................................15

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003).........................................................................3

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005).................................................................passim

*Renishaw PLC v. Marposs Societa' Per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998)........................................................................1

*S3, Inc. v. nVIDIA Corp.*,
    259 F.3d 1364 (Fed. Cir. 2001)......................................................................17

*Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995)
    54 F.3d 1570 (Fed. Cir. 1995)..........................................................................4

*Teleflex, Inc. v. Ficosa North America Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002).................................................................passim

*TI Group Automotive Sys. (N.A.), Inc. v. VDO N.A., L.L.C.*,
    375 F.3d 1126 (Fed. Cir. 2004)......................................................................16

*Toro Co. v. White Consolidated Indus., Inc.*, 266 F.3d 1367, 1371 (Fed. Cir. 2001)
    266 F.3d 1367 (Fed. Cir. 2001)......................................................................28

*W.E. Hall Co., Inc. v. Atlanta Corrugating, LLC*,
    370 F.3d 1343 (Fed. Cir. 2004).................................................................passim

*York Products, Inc. v. Central Tractor Farm & Family Ctr.*,
    99 F.3d 1568 (Fed. Cir. 1996)..........................................................................3

Statutes

35 U.S.C. § 112 (2009) ...............................................................................passim

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

35 U.S.C. § 282 (2009) .......................................................................................................passim

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

# TABLE OF APPENDICES

| Appendices | | | |
|---|---|---|---|
| *Appendices A-N were submitted in support of KSEA's Opposition to Defendants' Motion for Summary Judgment of Non-Infringement. (Doc. No. 127, 147 (redacted)). This brief cites to these appendices for support. The brief cites to an appendix ECF page number, and column and line numbers to the extent available. For example a citation to A23 at 1:1-5 would refer to Appendix A on page 23 at column 1, lines 1 to 5.* | | | |
| | **Description** | **Doc. No.** | **Pages** |
| A | U.S. Patent No. 5,788,688 | 129 | A1 to A34 |
| B | Portions of the Prosecution History of the '688 Patent | 130 | B1 to B32 |
| C | U.S. Patent No. 6,397,286 | 131 | C1 to C9 |
| D | Portions of the Prosecution History of the '286 Patent | 132 | D1 to D29 |
| E | U.S. Patent No. 6,824,539 | 133 | E1 to E19 |
| F | Portions of the Prosecution History of the '539 Patent | 134 | F1to F21 |
| G | Declaration of Erhan H. Gunday | 135 | G1 to |
| H | EP 0424687 to Baum et al. | 136 | H1 to H36 |
| I | A portion of U.S. Patent Application 08/361,686 to Bauer et al. | 137 | I1 to I35 |
| J | SIDNE Operation and Maintenance Manual (Rev E) | 138-141 | J1 to J64 |
| K | SIDNE 510(k) Summary of Safety and Effectiveness | 142 | K1 to K13 |
| L | U.S. Patent Application 09/180,682 to Chatenever et al. | 143 | L1 to L26 |
| M | A portion of the IEEE Standard Dictionary of Electrical and Electronic Terms (1984). | 144 | M1 to M8 |
| N | A portion of the IBM Dictionary of Computing (1994). | 145 | N1 to N5 |

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

| Appendices | | | |
|---|---|---|---|
| *Appendices O-DD are being submitted in support of KSEA's Cross Motion for Summary Judgment of Infringement. This brief cites to these appendices for support. The brief cites to an appendix ECF page number, and column and line numbers to the extent available. For example a citation to A23 at 1:1-5 would refer to Appendix A on page 23 at column 1, lines 1 to 5.* | | | |

| | **Description** | **Doc.** | **Pages** |
|---|---|---|---|
| O | 40L Insufflator Operation Manual | 156 | O1 to O80 |
| P | SIDNE-Valleylab Electro Surgical Unit Kit Development Document | 157 | P1 to P67 |
| Q | Addendum to Sidne Operating and Maintenance Manual | 158 | Q1 to Q7 |
| R | A portion of Plaintiff's Disclosure of Asserted Claims and Infringement Contentions Pursuant to Patent L.R. 3-1 | 159 | R2 to R8 |
| S | Expert Declaration of Erhan H. Gunday in Support of Plaintiff's Cross Motion for Summary Judgment of Infringement | 160 | S1 to S33 |
| T | SwitchPoint Infinity 1 Control System, Operations Manual | 161 | T1 to T47 |
| U | Expert Declaration of Professor David M. Yerkes in Support of Plaintiff's Cross Motion for Partial Summary Judgment of Infringement | 162 | U1 to U29 |
| V | SwitchPoint Infinity 2 Control System, Operations Manual | 163 | V1 to V65 |
| W | SIDNE Operation and Maintenance Manual | 164 | W1 to W123 |
| X | SIDNE Suite and SIDNE Link User Guide | 165 | X1 to X50 |
| Y | 888 Medical Video Camera Operating & Maintenance Manual | 166 | Y1 to Y23 |
| Z | Switch Point Infinity Development Document 1 | 167 | Z1to Z24 |
| AA | Marketing brochure for the iSuite Operating Rooms | 168 | AA1 to AA5 |
| BB | SIDNE Development Document 1 | 169 | BB1 to BB45 |
| CC | SIDNE Development Document 2 | 170 | CC1 to CC12 |
| DD | SIDNE Development Document 3 | 171 | DD1 to DD36 |

| Appendices | | | |
|---|---|---|---|
| *Appendix EE is being submitted in support of KSEA's Opening Claim Construction Brief.    The brief cites to an appendix ECF page number, and column and line numbers to the extent available.  For example a citation to A23 at 1:1-5 would refer to Appendix A on page 23 at column 1, lines 1 to 5.* | | | |
| | **Description** | **Doc. No.** | **Pages** |
| EE | Expert Declaration of Erhan H. Gunday in Support of Plaintiff's Opening Claim Construction Brief | n/a | EE1 to EE19 |

Beck, Ross, Bismonte & Finley, LLP
Fairmont Plaza
50 W. San Fernando St., 1300
San Jose, California 95113
Telephone (408) 938-7900

# TABLE OF DISPUTED CLAIM TERMS

U.S. Patent No. 5,788,688

| **"a surgeon's operating station at which a surgical procedure is performed"** (claims 1, 10 of the '688 patent) | |
|---|---|
| **KSEA:** One or more locations within an operating environment at which a member of the surgeon's team controls surgical equipment. | **Stryker:** The place within the sterile field of an operating room where the surgeon and more than one surgical instrument are located for conducting a surgical procedure. |
| • The construction of the claim term "**a surgeon's operating station**" is currently pending in *KSEA v. Smith & Nephew*, Case 2:07-cv-02702, in the Western District of Tennessee. That court held its claim construction hearing on December 3 and 4, 2009. | |

| "**a surgeon's control panel operatively positioned at the surgeon's operating station**" (claims 1, 10 of the '688 patent) | |
|---|---|
| **KSEA:** This claim passage identified by Stryker should not be construed (or rewritten) in its entirety. The identified passage includes multiple claim terms that should be construed on a limitation by limitation basis.<br><br>**"operatively positioned at the surgeon's operating station"** *means* operable from the surgeon's operating station.<br><br>To the extent the Court believes it is necessary to construe the claim passage identified by Stryker, KSEA proposes that "**a surgeon's control panel operatively positioned at the surgeon's operating station**" *means* a control panel operable from the surgeon's operating station. | **Stryker:** A panel for the surgeon that is positioned within the sterile field such that the surgeon can directly operate the panel from the surgeon's operating station by manually entering commands on the panel and by directly viewing data displays on the panel.<br><br>*See also* Disputed Claim Term "a surgeon's operating station at which a surgical procedure is performed." |
| • The construction of the claim term "**operatively positioned at the surgeon's operating station**" is currently pending in *KSEA v. Smith & Nephew*, Case 2:07-cv-02702, in the Western District of Tennessee. That court held its claim construction hearing on December 3 and 4, 2009. | |

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

<table>
<tr><td colspan="2">"<strong>whereby each of the plurality of self-contained pieces of surgical equipment can be simultaneously operated with the operation thereof controlled and monitored from the surgeon's operating station</strong>" (claims 1, 10 of the '688 patent)</td></tr>
<tr><td><strong>KSEA:</strong> Each of the two or more self-contained pieces of surgical equipment can be operated at the same time, and the operation of a self-contained piece of surgical equipment can be controlled and monitored from the surgeon's operation station.</td><td><strong>Stryker:</strong> Each piece of self-contained surgical equipment can be controlled and monitored at the same time from the surgeon's operating station through the surgeon's control panel.</td></tr>
<tr><td colspan="2">• The construction of "<strong>simultaneously operated</strong>" is currently pending in <em>KSEA v. Smith & Nephew</em>, Case 2:07-cv-02702, in the Western District of Tennessee. That court held its claim construction hearing on December 3 and 4, 2009.</td></tr>
</table>

<table>
<tr><td colspan="2">"<strong>display means</strong> for <u>displaying data relating to status of each of the plurality of self-contained pieces of surgical equipment</u>" (claim 1 of the '688 patent)</td></tr>
<tr><td><strong>KSEA:</strong> a panel display, which can include a liquid crystal display, and equivalents thereof for displaying data relating to status of each of the plurality of self contained pieces of surgical equipment.</td><td><strong>Stryker:</strong><br/><strong>Function:</strong> Displaying data, on the surgeon's control panel, that relates to status of each of the plurality of self-contained pieces of surgical equipment.<br/><br/><strong>Structure(s)/Act(s)/Material(s) Corresponding to Function:</strong> Red indicator displays, seven-segment 0.5 inch red high-intensity displays, LCD displays with backlighting capability, bar graph displays (ten-segment, high-density display units), high-intensity discrete red LEDs, with the surgeon's control panel simultaneously showing displays for all of the pieces of surgical equipment.</td></tr>
<tr><td colspan="2">• The construction of "<strong>display means</strong>" is currently pending in <em>KSEA v. Smith & Nephew</em>, Case 2:07-cv-02702, in the Western District of Tennessee. That court held its claim construction hearing on December 3 and 4, 2009.</td></tr>
</table>

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

Beck, Ross, Bismonte & Finley, LLP
Fairmont Plaza
50 W. San Fernando St., 1300
San Jose, California 95113
Telephone (408) 938-7900

| "**display means** for <u>displaying data relating to the output to each of the surgical instruments</u>" (claim 10 of the '688 patent) | |
|---|---|
| **KSEA:** a panel display, which can include a liquid crystal display, and equivalents thereof for displaying data relating to the output of each of the surgical instruments. | **Stryker:**<br>**Function:** Displaying data, on the surgeon's control panel, that relates to the output that each piece of surgical equipment delivers to its associated surgical instrument.<br><br>**Structure(s)/Act(s)/Material(s) Corresponding to Function:** Red indicator displays, seven-segment 0.5 inch red high-intensity displays, LCD displays with backlighting capability, bar graph displays (ten-segment, high-density display units), high-intensity discrete red LEDs, with the surgeon's control panel simultaneously showing displays for all of the pieces of surgical equipment. |
| • The construction of "**display means**" is currently pending in *KSEA v. Smith & Nephew*, Case 2:07-cv-02702, in the Western District of Tennessee.  That court held its claim construction hearing on December 3 and 4, 2009. | |

| "**input means** for <u>receiving commands entered manually</u>" (claims 1, 10 of the '688 patent) ||
|---|---|
| **KSEA:** a switch matrix, and equivalents thereof, for receiving commands entered manually. | **Stryker:**<br>**Function:**  Receiving commands that are manually entered on the surgeon's control panel.<br><br>**Structure(s)/Act(s)/Material(s) Corresponding to Function:**  A sterilizable membrane switch with an eight-bit by eight-bit switch matrix, the switch matrix being associated with a number of raised switches, buttons or keys that can be depressed by the surgeon, with the surgeon's control panel simultaneously presenting controls for all of the pieces of surgical equipment. |

- The construction of "**input means**" is currently pending in *KSEA v. Smith & Nephew*, Case 2:07-cv-02702, in the Western District of Tennessee.  That court held its claim construction hearing on December 3 and 4, 2009.

BECK, ROSS, BISMONTE & FINLEY, LLP<br>FAIRMONT PLAZA<br>50 W. SAN FERNANDO ST., 1300<br>SAN JOSE, CALIFORNIA 95113<br>TELEPHONE (408) 938-7900

U.S. Patent No. 6,397,286

| "**self-configuring bus**" (claim 1 of the '286 patent) | |
|---|---|
| **KSEA:** a communication network in which at least two connected devices automatically communicate with each other. | **Stryker:** a communication medium that can be shared by more than two devices and that automatically selects which device on the bus will serve as the bus master. |
| • The construction of the claim term "**self-configuring bus**" is currently pending in *KSEA v. Smith & Nephew*, Case 2:07-cv-02702, in the Western District of Tennessee. That court held its claim construction hearing on December 3 and 4, 2009. | |

| "**whenever a said instrument is either newly connected or is disconnected from said bus without interruption of the operation of the system**" (claim 1 of the '286 patent) | |
|---|---|
| **KSEA:** whenever an instrument is either newly connected or is disconnected from the bus without interruption of the operation of the system. | **Stryker:** whenever an instrument and the interface that directly links it to the bus are either newly connected to or disconnected from the bus without interruption of the operation of the system, where the bus is a communication medium that can be shared by more than two devices. |
| • The parties do not dispute the construction of this term in *KSEA v. Smith & Nephew*, Case 2:07-cv-02702, in the Western District of Tennessee. | |

<u>U.S. Patent No. 6,824,539</u>

| **"remotely controllable surgical device"** (claims 18, 27 of the '539 patent) | |
|---|---|
| **KSEA:** a device for use during a surgical procedure that can be controlled from a remote location. | **Stryker:** is a surgical device that is separated by space from the sterile field of the operating room, and controllable from the sterile field by entering inputs on the touchscreen. |
| • The construction of the claim term "**remotely controllable surgical device**" are currently pending in *KSEA v. Smith & Nephew*, Case 2:07-cv-02702, in the Western District of Tennessee. That court held its claim construction hearing on December 3 and 4, 2009. | |

| **"an interface, connected between the touchscreen controller and the first remotely controllable surgical device and the second remotely controllable surgical device, for converting the controller command protocol to the first and second command protocols, and for transforming inputs received by the touchscreen into commands for controlling the first and second remotely controllable surgical devices"** (claim 18 of the '539 patent)<br><br>**"interface"** (claim 27 of the '539 patent) | |
|---|---|
| **KSEA:** This claim passage identified by Stryker should not be construed (or rewritten) in its entirety. The identified passage includes multiple claim terms that should be construed on a limitation by limitation basis.<br><br>An "**interface**" is a communication link that enables communication. | **Stryker:** a device for enabling communications between the touchscreen controller and the first and second remotely controllable surgical devices that automatically converts the protocol used by the touchscreen controller into the different protocols used by the first and second remotely controllable surgical devices, and automatically transforms inputs on the touchscreen into control commands for the first and second remotely controllable surgical devices, where the interface was not originally designed to convert the touchscreen controller protocol to the specific protocol used by the second remotely controllable surgical device (i.e., the third party device), and where the interface connects the touchscreen controller to the first and second remotely controllable surgical devices. |
| • The constructions of the claim terms "**interface . . .**" and "**interface**" is currently pending in *KSEA v. Smith & Nephew*, Case 2:07-cv-02702, in the Western District of Tennessee. That court held its claim construction hearing on December 3 and 4, 2009. | |

BECK, ROSS, BISMONTE & FINLEY, LLP<br>FAIRMONT PLAZA<br>50 W. SAN FERNANDO ST., 1300<br>SAN JOSE, CALIFORNIA 95113<br>TELEPHONE (408) 938-7900

| "**wherein said first remotely controllable surgical is a first party device and said second remotely controllable surgical device is a third party device, the second command protocol being different from the first command protocol.**" (claim 18, 27of the '539 patent) | |
|---|---|
| **KSEA:**<br>**"a first party device"** *means* a device specifically designed to operate with the communication system.<br><br>**"a third party device"** *means* a device not specifically designed to operate with the communication system. | **Stryker:**<br>A "first party device" is a device specifically designed to operate with the communication system, i.e. a device specifically designed to communicate using a protocol that the interface was originally and specifically designed to convert to.<br><br>A "third party device" is a device not specifically designed to operate with the communication system, i.e. a device not specifically designed to communicate using a protocol that the interface was originally and specifically designed to convert to. |
| • The parties agreed to the construction of "**first party device**" and "**third party device**" in *KSEA v. Smith & Nephew*, Case 2:07-cv-02702, in the Western District of Tennessee. | |

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

## I. INTRODUCTION.

Karl Storz Endoscopy America, Inc. ("KSEA") submits this opening claim construction brief in support of its construction of the 10 terms whose construction will be most significant to the resolution of the case, as submitted in the parties' Patent Local Rule 4-3 Joint Claim Construction and Prehearing Statement, Dkt # 153. Many of these terms have been previously briefed for the Court in the parties' briefs and declarations regarding Stryker's Motion for Summary Judgment and KSEA's Motion for Partial Summary Judgment. With respect to those terms that have been previously discussed for the Court, KSEA herein summarizes the points previously raised in support of its constructions and addresses contentions raised by Stryker in its opposition to KSEA's Motion for Partial Summary Judgment.

## II. GENERALLY APPLICABLE LAW.

Claim construction is purely a matter of law. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). Claim construction begins with the words of the claim itself. *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("The claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim."). Claim terms are generally given their "ordinary and customary meaning." *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005); *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("heavy presumption" terms carry their ordinary and customary meaning). This ordinary and customary meaning "is the meaning that the terms would have to a person of ordinary skill in the art in question at the time of the invention . . . ." *Phillips*, 415 F.3d at 131. A patentee is presumed to have intended the ordinary meaning of a claim term in the absence of an express

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

1    intent to the contrary.  *York Products, Inc. v. Central Tractor Farm & Family Ctr.*, 99 F.3d 1568,

2    1572 (Fed. Cir. 1996).

3         In this case, the parties agree that a person of ordinary skill in the art of the patents-in-suit

4    is a person with at least about 3 years of experience in designing, developing and/or using medical

5    equipment for use in an operating room environment.  (Doc. No. 149 at ¶ 13 ("Expert Decl. of

6    Mr. Gunday Supp. Plt. Off. Dft. Mot. Summ. J").)

7         Claims "must [also] be read in view of the specification, of which they are a part."

8    *Phillips*, 415 F.3d at 1315.  Although the Federal Circuit has stated that the specification is the

9    single best guide for claim construction, the Federal Circuit has repeatedly warned of the danger

10   of reading limitations from the specification into the claims.  *Id.* at 1321-23; *see also Teleflex*, 299

11   F.3d at 1326 ("The claims must be read in view of the specification, but limitations from the

12   specification are not to be read into the claims."); *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363,

13   1372 (Fed. Cir. 2003) ("resort to the rest of the specification to define a claim term is only

14   appropriate in limited circumstances").  In some instances, the specification may reveal a special

15   definition given to a claim term by the patentee that differs from the meaning it would otherwise

16   possess.  *See CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed. Cir. 2002).  In

17   such cases, the inventor's lexicography governs; however, the patentee must clearly express an

18   intent to redefine the term.  *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.,* 262

19   F.3d 1258, 1268 (Fed. Cir. 2001).

20        Even when the specification describes only a single embodiment, the claims of the patent

21   will not be read restrictively.  *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352,

22   1366 (Fed. Cir. 2004).  Under the Patent Statute, the patentee is required to disclose the preferred

23   embodiment for practicing his invention.  35 U.S.C. § 112, first paragraph (2009).  The Federal

24   Circuit has repeatedly warned against reading limitations from the preferred embodiment into the

claims. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys. Inc.*, 381 F.3d 1111, 1122 (Fed. Cir. 2004); *Liebel-Flasheim Co. v. Medrad Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."). A court should not construe the claims to include only the disclosed embodiments "because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Phillips*, 415 F.3d at 1323.

Finally, the court can also consider the patent's prosecution history. *Phillips*, 415 F.3d at 1317. Stryker cites a number *pre-Phillips* decisions for the proposition that the "prosecution history . . . must be examined." In *Phillips*, however, the en banc panel held that, while the prosecution history should be considered by the court, "it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

The purpose of consulting the prosecution history is to exclude any interpretation that was disclaimed during prosecution. *Id.*; *see also Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). However, prosecution disclaimer must be unequivocal. *Id.* Where statements made by the applicant are inconsistent, or subject to multiple interpretations, the plain and ordinary meaning of the disputed claim term applies. *See W.E. Hall Co., Inc. v. Atlanta Corrugating, LLC*, 370 F.3d 1343, 1352 (Fed. Cir. 2004) ("Because [a prosecution history] dialogue is not necessarily inconsistent with the ordinary meaning of the term, we believe the district court was correct in using the plain and ordinary meaning.); *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1332 (Fed. Cir. 2004) ("Because the statements in the prosecution history are subject to multiple reasonable interpretations, they do not constitute a clear and unmistakable departure from the ordinary meaning of the [disputed] term . . ..").

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

In its Summary Judgment memorandum, Stryker improperly cites *Southwall Techs.* for the proposition that the doctrine of prosecution history estoppel is relevant to claim construction. (Doc. No. 110 at 17:13-16.)  Unlike prosecution disclaimer (which must be an unequivocal statement regarding the definition of a term), the doctrine of prosecution history estoppel is unrelated to claim construction.  *See Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995) (holding that "[t]he limitation on the range of equivalents that may be accorded a claim due to prosecution history estoppel is simply irrelevant to the interpretation of those claims.")

### III.   THE '688 PATENT CLAIM TERMS.

#### A.   The '688 Patent.

The '688 patent broadly claims a system for central control of multiple pieces of surgical equipment in an operating room.  To integrate the control and the monitoring of some or all of the equipment used in the endoscopic operating environment, the '688 patent specification discloses that the surgical equipment is connected to a central controller via a plurality of communication interface circuits suitable for transmitting data.  (A25 at 3:6-19.)  To provide integrated control over the multiple instruments, each control head is in communication with the central controller via a communication interface circuit.  (*Id.*)  The central controller is a microprocessor based control unit that interfaces with, and provides the capability to control and monitor, individual pieces of surgical equipment.  (A25.)

The '688 patent further discloses an inventive system wherein the output parameters of the individual control heads are transmitted to the central controller and displayed on video monitors in the surgical suite, in addition to the control panel displays.  (A25 at 4:18-38.)  The video displays, also referred to as heads-up-display ("HUD") monitors, allow the surgical team to view

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

the endoscopic camera feed, while simultaneously monitoring the output parameters of the multiple pieces of surgical equipment.  (A25 at 4:18-38.)

The '688 patent includes 22 claims.  (A33-34.)  KSEA asserts that Stryker infringes claims 1-20.  Claims 1 and 10 are independent.  (*Id*.)  Claims 2-9 depend from claim 1, meaning they include the limitations of claim 1 and additional limitations positively recited by the dependent claim.  (A33); 35 U.S.C. § 112 (2009).  Claims 11-20 depend from claim 10.  (A33-34.)

**B.     The Disputed Claim Terms of the '688 Patent.**

**1.     "a surgeon's operating station at which a surgical procedure is performed"** (claims 1, 10 of the '688 patent).

| **KSEA:** One or more locations within an operating environment at which a member of the surgeon's team controls surgical. | **Stryker:** The place within the sterile field of an operating room where the surgeon and more than one surgical instrument are located for conducting a surgical procedure. |
|---|---|

A person of ordinary skill would understand the "a surgeon's operating station at which a surgical procedure is performed" is one or more locations within an operating environment at which a member of the surgeon's team controls surgical equipment to perform a surgical procedure. (S¶19.)  This construction is directly supported by the language of claim 1. (S¶20.) For example, claim 1 expressly defines surgeon's operating station as the "endoscopic operating environment." A person of ordinary skill understands that the endoscopic operating environment is the place at which a member of the surgical team controls surgical equipment to perform a surgical procedure. (S¶21.)

KSEA's definition is further supported by the specification, which states "[b]roadly, there is disclosed herein a surgeon's command and control system used in an endoscopic operating environment defining a surgeon's operating station at which a surgical procedure is performed with a plurality of pieces of surgical equipment."  (A24 at 2:57-62; S¶21.)

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

Stryker's definition is improper because it limits the "surgeon's operating station" to the sterile field.  As discussed in KSEA's summary judgment brief, the '688 patent does not state that the surgeon's operating station is *defined* by the sterile area; to the contrary, the claim and the specification define it as the "endoscopic operating environment."  (S¶23.)  While the specification acknowledges that a portion of the surgeon's operating station can be located within a sterile area, it also indicates that the surgeon's operating station can include non-sterile areas. (S¶25.)

For example, as discussed in KSEA's summary judgment brief, the specification teaches that a heads-up display (HUD)  "is located at the surgeon's operating station," and Fig. 1 shows that the  HUD monitor 68 is located outside the dashed lines associated with the "sterile area." (A3, A25 at 4:31-32; A2 ("a heads-up display (HUD) monitor at the surgical operating station.").) Stryker attempts to dismiss this clear teaching by postulating that the statement "a heads-up-display (HUD) monitor at the surgical operating station" does not describe Fig. 1, but some other, unidentified embodiment.  Stryker cannot point to any portion of the '688 patent that describes the HUD being in the sterile field.  Stryker's rationale is nonsensical.

Stryker also contends that KSEA's construction allows the "surgeon's operating station" to be located with the "surgical control heads."  Stryker fails to recognize that there can be more than one non-sterile area in an operating room, just as there can be more than one sterile area in an operating room. (EE¶25.)  As a result, a surgeon's operating station can include one non-sterile area, while a control head can be located at another non-sterile area and still be considered remote from the surgeon's operating station. (EE¶25.)

Stryker focuses on the Applicant's discussion of the benefits of a preferred aspect of the invention in the specification and during the prosecution of the application to utilize a sterile control panel.  Providing a sterile control panel is introduced in dependent claim 9.  However, the

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

specification recognizes that a surgical procedure is performed by a surgeon's team and it is recognized that the members of this team are located at sterile and non-sterile areas.  (A26 at 6:33-36; S¶27.)  The specification teaches that the control panel is used by both sterile and non-sterile members of the surgeon's team.  (A26 at 6:40-45; S¶27).  Claim 9 also demonstrates that when the applicant intends the control panel to be sterile, the limitation is specifically recited.  Thus, the specification's teachings about the use of the control panel and dependent claim 9 further demonstrate that the surgeon's operating station is not limited to a sterile field.

Finally, Stryker's definition improperly limits "surgeon's operating station" to the location "where the surgeon and more than one surgical instrument are located."  Although the surgeon and the surgical instruments can be located at the surgeon's operating station, the location of the surgeon and surgical instruments do not define the surgeon's operating station.  Stryker's construction is contrary to the teachings of the patent and the knowledge of one skilled in the art that a surgical procedure is performed by a surgeon's team. (EE¶26.)  Stryker's construction is also contrary to the specification's teachings that the control panel, which is operatively positioned at the surgeon's operating station, is used by both sterile and non-sterile members of the surgeon's team. (EE¶26.)

    **2.**    "**a surgeon's control panel operatively positioned at the surgeon's operating station**" (claims 1, 10 of the '688 patent).

| **KSEA:** A control panel operable from the surgeon's operating station. | **Stryker:** A panel for the surgeon that is positioned within the sterile field such that the surgeon can directly operate the panel from the surgeon's operating station by manually entering commands on the panel and by directly viewing data displays on the panel. |
|---|---|

A person of ordinary skill would understand the disputed claim phrase as a "control panel operable from the surgeon's operating station." (S¶33.)  The plain language of the claim limitation supports this construction.

As with surgeon's operating station, Stryker seeks to limit the location of the surgeon's control panel to a location within the sterile field. Stryker also seeks to limit the location to a place where a surgeon can manually enter commands and view data displays on the panel.

However, the claim states that the control panel is operatively positioned relative to the surgeon's operating station. (S¶33.) It does not say that the control panel is operatively positioned within a sterile field or adjacent to a surgeon. Further, as discussed above, the patent teaches that the control panel is not limited in either manner proposed by Stryker, since the control panel can be used by both sterile and non-sterile members of the surgeon's team. (S¶35.) Still further, since dependent claim 9 specifically requires that the control panel be sterile, this confirms that the independent claims are not intended to be limited to a control panel in a sterile field. (S¶¶36-37.)

Stryker contends that the stated purpose: "to provide a surgeon direct command and control of the plurality of self-contained pieces of surgical equipment," necessitates the conclusion that the control panel is located at a sterile location adjacent to the surgeon. Stryker, however, ignores the teachings of the patent, even including the portion quoted in its opposition brief at page 15, which teaches that direct command and control is achieved via an assistant or other member of the surgeon's team entering commands on the control panel. (A25 at 4:40-44; A26 at 6:40-45; A27 at 7:31-33; EE¶29.) Simply put, the patent encourages the use of the control panel by sterile or non-sterile members of the surgeon's team and nowhere in the patent does it state that the surgeon loses command and control when a member of the surgeon's team operates the control panel.

Stryker also contends KSEA's construction would cover prior art systems discussed in the background section of the '688 patent. However, Stryker does not provide an analysis of how those prior art systems incorporate each and every element of claim 1 if KSEA's constructions are

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

applied.  Further, it is apparent from a review of that discussion that there are a number of

claimed elements missing from those prior art systems, including, for example, a control panel,

input means, display means, communication interface circuits, and a central controller. (EE¶30.)

It is also apparent from the prosecution history that the Applicant did not differentiate the

invention from the prior art based on the location of a control panel adjacent to a surgeon.  (*See*

*generally* B2-32; EE¶30.)

Stryker contends further that claim 9 does not introduce the concept of providing a sterile

control panel.  Stryker contends that claim 9 actually only refers to a control panel that has

undergone sterilization, and that the term "sterilized" does not cover the concept of making a

control panel sterile by covering it with a sterile drape.  However, Stryker's own dictionary

definition recognizes that to sterilize broadly means "to produce sterility." (*See* Declaration of

Andrew Bateman, Doc. No. 188 at Ex. M.)  One common procedure for making a device or item

sterile and using it in the sterile field is to cover it with a sterile drape. (EE¶31.)  In other words,

claim 9 is not limited to a control panel that is made sterile via a particular method, but rather

introduces the broad concept of providing a sterile control panel.

> **3.**   "**whereby each of the plurality of self-contained pieces of surgical equipment can be simultaneously operated with the operation thereof controlled and monitored from the surgeon's operating station**" (claims 1, 10 of the '688 patent).

| KSEA: (1)each of the two or more self-contained pieces of surgical equipment can be operated at the same time, and (2) the operation of a self-contained piece of surgical equipment can be controlled and monitored from the surgeon's operation station. | Stryker: Each piece of self-contained surgical equipment can be controlled and monitored at the same time from the surgeon's operating station through the surgeon's control panel. |
| --- | --- |

As argued by KSEA in its opposition to Stryker's summary judgment motion, one skilled

in the art would understand this claim limitation to provide two requirements:

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

(1)   each of the two or more self-contained pieces of surgical equipment can be operated at the same time, and

(2)   the operation of a self-contained piece of surgical equipment can be controlled and monitored from the surgeon's operation station.

This definition is derived from the plain and ordinary meaning of the disputed limitation and supported by the specification and the prosecution history. (G¶¶25-44.) Stryker's definition is improper for at least two reasons. First, Stryker's definition erroneously requires *control and monitoring* of two or more pieces of surgical equipment "at the same time." In the disputed phrase, the adverb "simultaneously" modifies the verb "operated." It does not modify the verbs "controlled" and "monitored," as Stryker alleges. (A33 at 20:7-10; A34 at 21:16-19.) Second, Stryker's definition erroneously requires that a piece of surgical equipment can be controlled and monitored from the surgeon's operating station "through the surgeon's control panel." This limitation is not supported by the plain and ordinary meaning of the disputed claim phrase. (*Id*.)

The disputed phrase states that "the surgical equipment can be simultaneously operated." (*Id*.) The adverb "simultaneously" modifies the verb "operated." (*Id*.) The parties agree that the plain and ordinary meaning of "simultaneously" is "at the same time." Therefore, a person of ordinary skill would understand "simultaneously operated" as "operated at the same time." (G ¶26.) The adverb "simultaneously" does not modify "controlled and monitored." (A33 at 20:7-10; A34 at 21:16-19.) As explained by Professor David Yerkes, an expert in English grammar:

> In the "whereby" clause the phrase "the operation thereof' refers to the operation of the surgical equipment, and the word "thereof' does not refer to anything other than the surgical equipment. The word "thereof' does not refer to the verb phrase "can be simultaneously operated" or to any part of that verb phrase.
> …
> For the adverb "simultaneously" to modify the verb phrase "controlled and monitored", the adverb "simultaneously" would have to jump ahead from one verb, "operated", that has one subject, "surgical equipment", to a different verb---or, more accurately, to a different verb phrase-"controlled and monitored", that has a different subject, "the operation" of surgical equipment. Such a jump is both grammatically and logically impossible.

…
In the "whereby" clause the adverb "simultaneously" modifies the verb "operated", and the verb "operated" has as its subject the noun phrase "each of the plurality of self-contained pieces of surgical equipment"

(*See* Yerkes Dec., U at §§7-9.)

Stryker argues that the "plain claim language[] requires that "each" piece of self-contained surgical equipment can be controlled and monitored "simultaneously."  (Doc. No. 110 at 10:14-17.)  In opposition to KSEA's partial motion for summary judgment, Stryker attempts to justify its construction by using the 10th of 19 possible definitions of the term "with" from the American Heritage dictionary, which recites: "at the same time as." According to Stryker, the meaning of the term "with" is not demonstrated by the 18 other possible definitions, such as the 3[rd] meaning: "having."   The fact that the claims do not invoke the meaning "at the same time as" is clear for a couple of reasons.

First, claims 1 and 10 demonstrate that when the applicant intended to invoke "at the same time" the term "simultaneously" is used.  More importantly, the true application of Stryker's definition to the limitation results in an incoherent statement:

> whereby each of the plurality of self-contained pieces of surgical equipment can be simultaneously operated **[at the same time as]** the operation thereof controlled and monitored from the surgeon's operating station.[1]

This demonstrates that the American Heritage dictionary's 10th definition of "with" was not intended when the applicant used this term.  Rather, the term "with" simply reflects the fact that both conditions must be satisfied.  (EE¶13.)

Contrary to Stryker's representation, KSEA's construction is not a redundant limitation. As discussed in KSEA's opposition to Stryker's motion for summary judgment, the "whereby" clause was added during the prosecution of the application leading to the '688 patent based on an

---

[1] It is noteworthy that Stryker omits the word "as" and substitutes the word "that" in order to apply the 10th definition of "with" to the whereby clause.

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

agreement between the Applicant and the Examiner to distinguish the claims over a European

Patent Application to Baum et al. ("Baum.") (G¶41.)  Prior to that amendment, both conditions—

that two or more pieces of surgical equipment that can be operated at the same time and the

surgical equipment can be controlled and monitored from the surgeon's operating station—did

not need to be satisfied by the claimed system. (EE¶14.)  Further, both conditions could not be

achieved by the Baum reference, which neither Stryker nor its expert appear to dispute.  Limiting

the scope of the claim in this manner was not redundant to the limitations already present, and it is

clear that the other amendments introduced to the claim were intended to complement the

whereby clause. (EE¶14.)  Even if the whereby clause introduces concepts that are redundant to

other elements of the claim, this does not justify construing the whereby clause contrary to its

plain language, as proposed by Stryker.

        In its opposition to KSEA's Motion for Partial Summary Judgment, Stryker also reiterates

its reliance on Figure 4 of the specification to argue a narrower construction of this phrase than is

actually disclosed.  As noted in KSEA's original opposition to Stryker's Motion for Summary

Judgment, as a preliminary matter, it is not proper to limit the disputed claim term to the

embodiment disclosed in Figure 4 because it is an improper attempt to read limitations from the

preferred embodiment into the claims.  This type of narrowing construction is completely at odds

with the cannons of claim construction.  *See e.g. Phillips*, 415 F.3d at 1323 (Fed. Cir. 2005); *see*

*also Teleflex, Inc.*, 299 F.3d at 1326.  Even when the specification describes only a single

embodiment, the claims of the patent should not be read restrictively.  *Gemstar-TV Guide Int'l,*

*Inc.*, 383 F.3d at 1366.

        More significantly, Stryker's definition does not comport with the embodiment disclosed

in Figure 4.  While the Figure 4 embodiment may simultaneously *display* information from

multiple pieces of surgical equipment, one cannot simultaneously *control* multiple pieces of

surgical equipment.  This is because, for the embodiments disclosed in the '688 patent, it is impossible to control the operation of two or more pieces of surgical equipment at the exact same time from the surgeon's control panel because the control panel can only receive one command at a time, and because the serial communication link between the control panel and the central controller can only transmit one command at a time.  (G ¶¶31-36.)

Further, Stryker's reliance on the prosecution history does not support its construction of the whereby clause.  As discussed above, and in KSEA's original opposition brief, the whereby clause was added to the claims based on an agreement with the Examiner to distinguish the claims from Baum, based on the fact that, with the Applicant's invention, two or more pieces of surgical equipment can be operated at the same time <u>and</u> the surgical equipment can be controlled and monitored from the surgeon's operating station.

Contrary to Styker's arguments, the Applicant's remarks regarding "simultaneously control and monitor" were not made for the purpose of distinguishing the invention from the Baum reference.  This casual remark was made when explaining there was adequate support in the specification, for the purposes of avoiding a new matter rejection.  Further, the Applicant's casual reference to "simultaneously control and monitor" clearly did not mean to *literally* control and monitor at the *exact* same time, and the Applicant was not describing this as a distinction between the claimed invention and the prior art.  For the reasons explained above, such control is not achieved by the device disclosed in the'688 patent itself.  Rather, the Applicant's remark was undoubtedly a reference to the fact that each of the pieces of surgical equipment is *controll<u>able</u>* at the same time.  In other words, at any given time, each of the instruments can be controlled from the surgeon's operating station.  But this does not mean that multiple pieces are actually controlled at the exact same time (which is not possible).  Indeed, each of the Applicant's citations to the original application that accompany these remarks support operation of two or

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

more pieces of self-contained pieces of surgical equipment.  The cited material does not support

actually controlling two or more pieces of surgical equipment at the exact same time.  (B29-30

(for a list of citations); *see cited material at* I12:7-14; I12:29 to I13:2; I13:3-10; I13:15-22;

I14:23-26; I15:3-12; I15:21 to I16:17.)

Finally, since prosecution disclaimer must be unequivocal, to the extent that this remark

concerning simultaneous control and monitoring were deemed inconsistent, this single statement

in the prosecution history would not create a disclaimer or disavowal, as suggested by Stryker,

especially considering the plain and ordinary meaning of the amendment, the purpose of the

amendment, and the citations to the record by the Applicant, and the technology disclosed in the

patent.  *Omega Eng'g, Inc.*, 334 F.3d at 1324; *Golight, Inc.*, 355 F.3d at 1332.  As previously

noted, where statements made by the applicant are inconsistent, or subject to multiple

interpretations, the plain and ordinary meaning of the disputed claim term applies.  *See W.E. Hall

Co., Inv.*, 370 F.3d at 1352.

Stryker, in its opposition, also tries to argue that KSEA is misapplying Stryker's

construction.  Stryker appears to walk away from its original construction and argue that the

whereby clause now means that the "surgeon can monitor (i.e. see status displays for) all of the

pieces of surgical equipment at the same time…and that the controls for all of the pieces of

surgical equipment are present and available to the surgeon at the same time."  While Stryker

previously advocated "control and monitor at the same time," Stryker now advocates: display

information and controls for multiple pieces of equipment at the same time.  This alternative

construction is clearly not recited by the claims and should be rejected, as it is not remotely

suggested by the claims or the prosecution history.

Stryker's construction is also flawed because it erroneously construes the whereby clause

as requiring that a piece of surgical equipment can be controlled and monitored from the

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

surgeon's operating station "through the surgeon's control panel." This limitation is not

supported by the plain and ordinary meaning of the claim phrase, which requires that a piece of

surgical equipment is "controlled and monitored from the surgeon's operation station." (A33 at

20:7-10; A34 at 21:16-19.) As previously discussed, the specification teaches that a heads-up-

video display can be used to monitor surgical equipment and that a microphone can be used to

control surgical equipment. (A24 at 3:45-50; A25 at 4:56-59.)

Stryker in its opposition brief contends that control and monitoring must be provided by

the control panel because, according to Stryker, the control panel is the only element that can

control and monitor surgical equipment from the surgeon's operating station. This is not correct.

As the patent teaches, the plurality pieces of surgical equipment have displays and the surgical

equipment can provide controls at the surgeon's operating station, such as hand and foot switches.

(A29 at 12:45.) Thus, the whereby clauses of claims 1 and 10 do not necessitate that both

controlling and monitoring of surgical equipment be provided by the control panel. (EE¶14.)

### C.     Disputed Means-Plus-Function Claim Terms.

#### 1.     Construction of 35 U.S.C. § 112, Sixth Paragraph, Claim Terms.

Under 35 U.S.C. § 112, sixth paragraph, an element in a claim may be expressed as a

means or step for performing a specified function without the recital of structure, material, or acts

in the claim. 35 U.S.C. §112, sixth paragraph (2009). An element pursuant to § 112, sixth

paragraph, is referred to as a means-plus-function claim limitation. Means-plus-function claim

limitations are "construed to cover the corresponding structure, material, or acts described in the

specification and equivalents thereof" for performing the recited function. *Id.*

The court performs a two-step process to construe a means-plus-function claim limitation.

First, the court identifies the claimed function. *Micro Chem., Inc. v. Great Plains Chem. Co.,*

*Inc.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). The court determines the claimed function directly

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

from the claim language.  *Id.*  It is important to first identify the function associated with means-plus-function claim language before identifying the corresponding structure, material, or acts in the specification of the patent.  *See JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (2005) (holding that "[d]etermining a claimed function and identifying structure corresponding to that function involve distinct, albeit related, steps that must occur in a particular order").  Errors arise when courts attempt to identify the function of a claimed invention in reference to a working embodiment, rather than by identifying the function solely based on the claim language.  *Id.*  Attributing functions to a working device, rather than focusing on the claim language, may wrongly sweep additional functions into the claim.  *Id.*

The second step in construing a means-plus-function claim limitation is to identify the recited structure in the specification that is capable of performing the recited function.  A proper construction accounts for "all structure in the specification corresponding to the claimed function."  *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1369 (Fed. Cir. 2005).  A claim limitation does not include "elements that are not necessary for performing the recited function."  *See TI Group Automotive Sys. (N.A.), Inc. v. VDO N.A., L.L.C.*, 375 F.3d 1126, 1135 (Fed. Cir. 2004) *cert. denied*, 543 U.S. 1147 (2005); *see also Data General Corp. v. I.B.M. Corp.*, 93 F. Supp.2d 89, 94 (D. Mass. 2000) ("[W]here the specification elaborates on the details of the preferred embodiment, 'more particularly defining structure in ways unrelated to the recited function, . . . [those] additional structural aspects are not what the statute contemplates as structure corresponding to the recited function.'")

It is an error to limit the structure to the preferred embodiment disclosed in the specification.  *See Callicrate*, 427 F.3d at 1369 (holding that "the description of the preferred embodiments is not a sufficient reason for  . . . limiting [means plus function] claims"); *Clearstream Wastewater Sys. Inc. v. Hydro-Action Inc.*, 206 F.3d 1440, 1446 (Fed. Cir. 2000)

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

(holding that it was error for the district court to conclude that the means limitations . . . could only cover new elements of the preferred embodiment").

Courts are "generous in finding something to be a corresponding structure when the specification contain[s] a generic reference to structure that would be known to those in the art and that structure was clearly associated with performance of the claimed function." *Medical Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1213-14 (Fed. Cir. 2003) *cert. denied*, 541 U.S. 959 (2004); *see also Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003) (holding that there was no need for a disclosure of the specific program code if software were linked to the converting function and one skilled in the art would know the kind of program to use); *S3, Inc. v. nVIDIA Corp.*, 259 F.3d 1364, 1370-71 (Fed. Cir. 2001) (stating that one skilled in the art would "recognize that the selector as shown in the specification [was] an electronic device such as a simple multiplexer, whose structure [was] well known); *see also Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1381 (Fed. Cir. 2001) ("It is important to construe claim language through the "viewing glass" of a person skilled in the art.").

In addition to structures, materials, or acts of the embodiments described in the patent's specification, the patentee is entitled to "equivalents thereof" as of the time the patent issued. Unlike the determination of function and corresponding structure, which are an issue of law for claim construction, the determination of "equivalents" is an issue of fact that is left to the determination of the fact finder. *Cybor Corp. v. FAS Tech., Inc.*, 138 F.3d 1448, 1467 (Fed. Cir. 1998).

> 2.  "**display means** for <u>displaying data relating to status of each of the plurality of self-contained pieces of surgical equipment</u>" (claim 1 of the '688 patent),    or
>
> "**display means** for <u>displaying data relating to the output to each of the surgical instruments</u>" (claim 10 of the '688 patent).

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

| KSEA: | Stryker: |
|---|---|
| **Claim 1**: A panel display, which can include a liquid crystal display, and equivalents thereof for displaying data relating to status of each of the plurality of self contained pieces of surgical equipment.<br><br>**Claim 10:** A panel display, which can include a liquid crystal display, and equivalents thereof for displaying data relating to the output of each of the surgical instruments. | **Function (claim 1):**  Displaying data, on the surgeon's control panel, that relates to status of each of the plurality of self-contained pieces of surgical equipment.<br><br>**Function (claim 10):** Displaying data, on the surgeon's control panel, that relates to the output that each piece of surgical equipment delivers to its associated surgical instrument.<br><br>**Structure(s):**  Red indicator displays, seven-segment 0.5 inch red high-intensity displays, LCD displays with backlighting capability, bar graph displays (ten-segment, high-density display units), high-intensity discrete red LEDs, with the surgeon's control panel simultaneously showing displays for all of the pieces of surgical equipment. |

The first step of construing the disputed term, "display means," is to determine the recited function.   The function recited in claim 1 for "display means" is "displaying data relating to status of each of the plurality of self contained pieces of surgical equipment."  (A33 at 19:53-55.) The function recited in claim 10 for "display means" is "displaying data relating to the output to each of the surgical instruments."  (A34 at 21:1-2.)  KSEA analyzes these two different "display means" limitations together because each recited function relates to the display of data, and each party has identified a consistent structure for claim 1 and 10.

First, the parties identify substantially the same function for "display means" as used in claim 1 and claim 10.  The parties, however, dispute the structure for performing the recited function.

The second step in construing "display means" is to identify the structure in the specification corresponding to the claimed function.  The specification plainly states that the structure for performing the recited function of claim 1 and 10 is a panel display, which can include, for example, a liquid crystal display.  (A28 at 9:42-43; S¶40.)

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

Stryker, on the other hand, seeks to limit the display means to a specific list of elements, namely: red indicator displays, seven-segment 0.5 inch red high-intensity displays, LCD displays with backlighting capability, bar graph displays (ten-segment, high-density display units), high-intensity discrete red LEDs." The structure identified by Stryker is overly narrow because it unnecessarily limits the structure to particular optical components that can be included on the panel display. The generic structure disclosed in the patent required to perform the function in question is a panel display. (A28 at 9:8-52; S¶41); *see also Medical Instrumentation*, 344 F.3d at 1213-14. Nonetheless, it should be noted that the '688 patent discloses that an LCD display is a form of a panel display and Stryker's touch panels utilize an LCD display. (S¶41.)

Stryker's identified structure for "display means" is also improper because it reads in a function. Under the patent laws, it is not proper to incorporate a "function" into a recited structure. *JVW Enters., Inc.*, 424 F.3d at 1330 (noting that attributing functions to a working device, rather than focusing on the claim language, may wrongly sweep additional functions into the claim.) Specifically, Stryker attempts to read into the recited structure the additional function "of simultaneously showing displays for all of the pieces of surgical equipment." This Court should completely disregard this back door attempt to narrow the disputed claim term.

        3.    "**input means** for <u>receiving commands entered manually</u>" (claims 1, 10 of the '688 patent).

| KSEA: A switch matrix, and equivalents thereof, for receiving commands entered manually. | **Stryker:**<br>**Function:** Receiving commands that are manually entered on the surgeon's control panel.<br><br>**Structure(s)/Act(s)/Material(s) Corresponding to Function:** A sterilizable membrane switch with an eight-bit by eight-bit switch matrix, the switch matrix being associated with a number of raised switches, buttons or keys that can be depressed by the surgeon, with the surgeon's control panel simultaneously presenting controls for all of the pieces of surgical equipment. |

First, the parties substantially agree to the recited function.

The '688 patent clearly discloses that a "switch matrix" performs the function of receiving commands entered manually.  (A27 at 8:51; S¶45.)  Stryker's construction is improper because it limits the disclosed structure to "an eight-bit by eight-bit switch matrix."  This limitation is improper because the specification broadly discloses a switch matrix as the structure for receiving commands.  (A27 at 8:51.)

In addition to generically disclosing a "switch matrix," the specification discloses that an eight bit by eight bit switch matrix in the preferred embodiment.  A person of ordinary skill in the art would understand and recognize that other types of switch matrixes could be employed. (S¶48); *See Callicrate*, 427 F.3d at 1369 (holding that "the description of the preferred embodiments is not a sufficient reason for . . . limiting [means plus function] claims"); *Clearstream Wastewater Sys. Inc.*, 206 F.3d at 1446 (Fed. Cir. 2000) (holding that it was error for the district court to conclude that the means limitations . . . could only cover new elements of the preferred embodiment.")

Also, a discussed above, courts are "generous in finding something to be a corresponding structure when the specification contain[s] a generic reference to structure that would be known to those in the art and that structure was clearly associated with performance of the claimed function."  *Medical Instrumentation & Diagnostics Corp.*, 344 F.3d at 1213-14 *cert denied*, 541 U.S. 959 (2004); *see also Intel Corp.*, 319 F.3d at 1366.

Stryker 's identified structure is also improper because it requires "a sterilizable membrane switch ... the switch matrix being associated with a number of raised switches, buttons or keys that can be depressed by the surgeon."  While these features are elements that are disclosed as being applicable in a preferred embodiment, these features are not taught by the specification as being required to perform the recited function of receiving commands entered manually. (S¶49.)  The features identified by Stryker are optional, additional structures that do not

themselves *receive* commands that have been entered manually.  (A27 at 8:49-9:40; S¶49.)

Moreover, they represent other aspects of the preferred embodiment of the control panel that

perform different functions.  (S¶49.)  For instance, these features may be useful for identifying a

command to enter (i.e. "buttons") or sterilizing a control panel (i.e. "sterilizable"), but these

features do not receive the command that has been manually entered.

Finally, Stryker's recited structure improperly includes the function "simultaneously

presenting controls for all of the pieces of surgical equipment."  (Doc. No. 153-1 at 4-5.)

However, the only function required by the claim for an input means is "receiving commands

entered manually."

## IV.    THE '286 PATENT CLAIM TERMS.

### A.    The '286 Patent.

Similar to the '688 patent, the '286 patent "relates to a system for centrally monitoring

and/or controlling at least one unit for endoscopy . . . ."  (C5 at 1:6-8.)  The '286 patent

recognizes that systems for centrally monitoring and/or controlling endoscopic units are known.

(C5 at 1:11-12.)  In these systems:

> the unit to be controlled is connected to a master computer via an interface (serial
> or parallel interface in EP 0 319 762 A1) or a network (e.g. DE 92 18 373 U1)
> which controls the device and displays the operating parameters of the unit on a
> monitor.

(C5 at 1:27-30.)  The technology disclosed in the '286 patent seeks to improve these known

systems so that:

> a large number of (different or identical) units can be centrally controlled at a
> comparatively low expenditure, specifically in terms of the units to be controlled,
> with the replacement of failed units or the connection of new units being possible
> during the ongoing operation without any problems and particularly without
> interference with the other units.

(C5 at 2:3-9.)  The inventive system can be characterized by the following features:

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

the units are connected via the interfaces on a self-configuring bus to a BUS master,

the BUS master configures the bus automatically, and

the BUS master monitors the communication on the bus for correct functioning.

It is hence possible to connect or disconnect units during operation so that the "network" can adapt itself to varying situations in a surgical operation, for instance. It is also possible in particular to replace failed units.

It is a particular advantage that the BUS reconfigures itself during operation when units are newly connected or disconnected.  This is accompanied by the additional advantage that the bus is automatically terminated.

(C5 at 2:21-33.)

In other words, as stated by the Applicant during the prosecution of the application leading to the '286 patent, the inventive system:

[r]elates to a bus system in which the various subsystems or instruments can be rapidly connected or disconnected even during operation of the system without any interruption of the operation of the remainder of the system or risk of damage.

(D20.)  As such, independent claim 1 requires:

1. System for centrally controlling a plurality of instruments for endoscopy characterized by:

a self-configuring bus and a bus master and a plurality of interfaces interconnecting the instruments to the self-configuring bus;

the instruments being operatively connected via interfaces on the self-configuring bus to said bus master,

the bus master monitoring communication on the bus for correct execution;

the bus master configuring the bus automatically whenever a said instrument is either newly connected or is disconnected from said bus without interruption of the operation of the system.

(C8 at 7:8-20.)

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

B.      **The Disputed Claim Terms of the '286 Patent.**

1.      **"self-configuring bus"** (claim 1 of the '286 patent).

| **KSEA:** a communication network in which at least two connected devices automatically communicate with each other. | **Stryker:** a communication medium that can be shared by more than two devices and that automatically selects which device on the bus will serve as the bus master. |
|---|---|

A person of ordinary skill in the art at the time of the invention would understand the "self-configuring bus" to be a communication network in which at least two connected devices automatically communicate with each other.  (EE¶33.)  The term "self-configuring bus" can be understood based on the common meaning of the term bus and the use of the term in claim 1 as well as the specification.  The term bus is a term of art used with computer systems and can be understood to mean a medium, such as a wire line, across which two or more devices communicate.  (EE¶35.)

Claim 1, as well as the specification, indicates that: 1) instruments are "operatively connected via interfaces on the self-configuring bus to said bus master"; 2) that the bus master monitors communication on the bus; and 3) the bus master configures the bus automatically when an instrument is newly connected or disconnected from the bus.  (EE¶39.)  Thus, both the description of the invention, and claim 1, indicate that the bus of claim 1 is "self-configuring" because the "bus master" performs the function of "configuring the bus automatically whenever a said instrument is either newly connected or is disconnected from said bus without interruption of the operation of the system."  (EE¶40.)  Based on the common understanding of the term bus and the '286 patent's use of the term "self-configuring bus," the appropriate definition of "self-configuring bus" is a communication network in which at least two connected devices automatically communicate with each other.

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

As discussed in KSEA's opposition to Stryker's summary judgment motion, Stryker improperly seeks to limit a "self-configuring bus" to "a communication medium that can be shared by more than two devices" and excludes systems that incorporate point-to-point serial communication. Stryker's construction of this term should be rejected because this construction is overly restrictive relative to the accepted meaning of this term and excludes bus configurations that the specification teaches are within the scope of the invention. (G ¶¶68-69.)

The term bus is understood to mean "[o]ne or more conductors used for transmitting signals or power from one or more sources to one or more destinations." (M1-8.) Stryker's definition is improper because it suggests that a bus is formed by a single medium, which is contrary to the accepted definition. (G ¶68.) The patent itself states and claims that, in one embodiment, the bus configuration can be implemented via a two-wire line and in another embodiment that "the power supply of the interface may be provided via the bus line by means of lines which are not required for communication." (C5 at 2:52-55, 63-66; C8 at cl. 3, 5.) The patent indicates that the patentee intended to adopt the accepted definition. (G¶67.)

Stryker contends that its definition is supported by its interpretation of the prosecution history and argues that a system with point-to-point serial communications is outside the scope of the claims. However, as discussed in KSEA's opposition brief, the applicant did not distinguish the invention on the ground that the prior art incorporated point-to-point serial communications. (G¶69.) The applicant simply noted that, for the particular embodiment disclosed in the prior art, the bus was not configured automatically whenever a device was newly connected or disconnected. The applicant did not state that the invention excluded point to point serial communications. In fact, as also discussed in KSEA's opposition brief, one of the bus architectures identified as being useful for implementing the invention utilizes point-to-point serial communications as a part of the overall bus structure. (G ¶69.)

Stryker's construction also attempts to import a potential characteristic of the invention disclosed in the '286 patent that is disclosed in the specification but not required by claim 1. Specifically, Stryker seeks to require that the self-configuring bus "automatically selects which device on the bus will serve as the bus master." However, such functionality is not referred to or recited by claim 1. While the '286 patent discloses that the invention can include a system in which more than one bus master is connected to a bus (multi-master operation) and that in such an event it is preferable that arbitration or assignment of priorities as to which acts as a bus master is provided, the specification does not disclose that these characteristics are necessary features of the inventive system. (C6 at 3:28-32; EE¶46.) The impropriety of Stryker's construction is accentuated by the fact that the requirements of the system to provide bus arbitration or multi-master operation generally is introduced in dependent claims 3 and 11 respectively. (EE¶¶47-49.) Thus, the doctrine of claim differentiation further supports the fact that claim 1 does not necessarily require such limitations. Under this doctrine, the existence of a dependent claim that adds a particular limitation gives rise to a presumption that the added limitation is not present in the independent claim. *Phillips*, 415 F.3d at 1314.

> **2.**    "**whenever a said instrument is either newly connected or is disconnected from said bus without interruption of the operation of the system**" (claim 1 of the '286 patent).

| **KSEA:** whenever an instrument is either newly connected or is disconnected from the bus without interruption of the operation of the system. | **Stryker:** whenever an instrument and the interface that directly links it to the bus are either newly connected to or disconnected from the bus without interruption of the operation of the system, where the bus is a communication medium that can be shared by more than two devices. |
|---|---|

As discussed in KSEA's opposition to Stryker's summary judgment motion, one skilled in the art would understand this phrase as it is presented in the claim. Stryker's construction of this phrase seeks to:

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

(1) Improperly limit the term bus to "a communication medium that can be shared by *more than two* devices"; (*Id*.) and

(2) Improperly rewrite this phrase to mean "'whenever an instrument *and the interface that directly links it* to the bus are either newly connected to or disconnected from the bus without interruption of the operation of the system'"; (Doc. No. 110 at 22:11-20.)

As discussed above, Stryker's construction of the term bus should be rejected because it is not supported by the specification or the common meaning of this term.

Further, as discussed in KSEA's opposition to Stryker's summary judgment motion, Stryker's rewriting of this phrase to recite "whenever an instrument *and the interface that directly links it* to the bus" should also be rejected because it is contrary to the plain language of claim 1. (C8 at claim 1.)  Claim 1 explicitly states that the bus master configures the bus when *instruments* are connected or disconnected.  (*Id*.) Claim 1 does not state that the bus master configures the bus when *interfaces* are connected or disconnected from the bus.  (*Id*.)  While a bus that is configured when an interface is connected or disconnected may be within the scope of the claims, the claim does not state that this is required.

Stryker tries to argue in its summary judgment papers that, during the course of prosecuting the application leading to the '286 patent, the applicant made arguments regarding the scope of the claims in order to obtain allowance over Branson, U.S. Pat. No. 5,877,819.  Claim 1 of the '286 patent is in fact a combination of original claims 1 and 2 of the application leading to the '286 patent.  (*Compare* L18 *with* C8 at claim 1.)  Similar to the current claim 1, the original claim 1 required the bus master to configure the bus automatically.  (*Id*.) Original claim 2 simply stated that this automatic configuration occurred when a unit was newly connected or disconnected from the bus.  (L18.)   While the Examiner may have rejected claim 1 in view of the '819 patent, the Examiner did not reject claim 2 in view of this reference.  (D7.)  Subsequent to

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

the Examiner's rejection, the applicant amended claim 1 to include the limitation of claim 2. (D21.)

Included with the applicant's amendments were remarks in which the applicant simply noted that the PCI bus disclosed in the '819 patent was not reconfigured whenever a device is newly connected to or disconnected from it during operation. (D19-20.)  The applicant did note that the '819 patent disclosed providing a PCMCIA adapter to connect a device with a PCMCIA card to that bus.  (*Id*.)  However, as noted by the applicant, this adapter simply helped avoid the need to reconfigure the PCI bus whenever a device with a PCMCIA card was connected to or disconnected from the system because a PCMCIA adapter isolated the device from the PCI bus. (*Id*.)  This statement, though, does not necessitate the conclusion that one only practices the invention when using a bus that is reconfigured whenever an instrument *and an interface* is connected or disconnected from the bus.  (G ¶63.) Nothing identified in the prosecution history, the patent specification, or other extrinsic evidence demonstrates that all "interfaces" isolate a device from a bus and thereby preclude the need to reconfigure the bus.  The applicant's remarks were nothing more than a note about the difference between a specific example provided by the '819 patent and the claimed invention.  Namely, the PCI bus disclosed in the '819 patent was not configured automatically whenever a device was newly connected or disconnected to it.

## V.     THE '539 PATENT CLAIM TERMS.

### A.     The '539 Patent.

The '539 patent, which recognizes the contribution of the '688 patent, claims a communication system for the central control and monitoring of multiple pieces of surgical equipment.  (E13 at 2:6-8, 2:50-54.)  The invention provides a communication system for seamlessly combining first party surgical devices and third party surgical devices in an integrated communication network.  (E13 at 2:59-62.)  The '539 patent further claims a system that is

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

capable of displaying, on a central controller, images replicating control heads of different surgical devices so that the surgeon is familiar with the layout of the control head and does not need to spend time learning and becoming familiar with new configurations. (E14 at 2:60-65; E15 at 6:40-45.)

The '539 patent includes 37 claims. (E18-19.) KSEA currently asserts that Stryker infringes claims 18-19, and 27. Of the asserted claims, 18 and 27 are independent. (E17-18.) Claim 19 depends on claim 18. (E18-19.)

### B.    The Disputed Claim Terms of the '539 Patent.

1.    "**remotely controllable surgical device**" (claims 18, 27 of the '539 patent).

| **KSEA:** a device for use during a surgical procedure that can be controlled from a remote location. | **Stryker:** is a surgical device that is separated by space from the sterile field of the operating room, and controllable from the sterile field by entering inputs on the touchscreen. |
|---|---|

A person of ordinary skill in the art would understand that a "remotely controllable surgical device" is "a device for use during a surgical procedure that can be controlled from a remote location." (EE¶51.) Stryker attempts to distort the plain and ordinary meaning of this claim term by improperly reading limitations into the construction.

Stryker's definition is improper because it requires spatial limitations related to the sterile field. Specifically, Stryker's definition requires that the "surgical device is separated by space from the sterile field," and is "controllable from the sterile field." The words "sterile" and "field" are not recited in any claim of the '539 patent. *See Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) ("[t]he danger of improperly importing a limitation is even greater when the purported limitation is based upon a term not appearing in the claim.) (citing *McCarty v. Lehigh Val. R.R.*, 160 U.S. 110, 116 (1895) ("If we once begin to include elements not mentioned in the claim in order to limit such claim . . . , we should never know

where to stop.").  Moreover, it is error to import functional language into the claim term because

independent claim 18 only recites structural features.  *See Toro Co. v. White Consolidated Indus.,*

*Inc.*, 266 F.3d 1367, 1371 (Fed. Cir. 2001) (holding that it is error to import a function limitation

from the specification into the claim, especially when the claim recites only purely structural

limitations).  While it is true that the specification indicates that a potential benefit of the

invention is the use of a touchscreen in a sterile field, that benefit has not been incorporated in the

claims.  (E15 at 5:47.)  As a result, one skilled in the art would not understand the term "remotely

controllable surgical device" to mean those devices that are controlled by a touchscreen in the

sterile field.  (EE¶53.)

      Finally, Stryker's definition improperly includes the limitation that the surgical devices

are remotely controllable using the touchscreen.  This definition renders the undisputed term of

claim 1, "controllable by said touch screen," superfluous.

> **2.** "**an interface, connected between the touchscreen controller and the first remotely controllable surgical device and the second remotely controllable surgical device, for converting the controller command protocol to the first and second command protocols, and for transforming inputs received by the touchscreen into commands for controlling the first and second remotely controllable surgical devices**" (claim 18 of the '539 patent),  or
>
> "**interface**" (claim 27 of the '539 patent).

| KSEA: This claim passage identified by Stryker should not be construed (or rewritten) in its entirety.   The identified passage includes multiple claim terms that should be construed on a limitation by limitation basis.<br><br>An "**interface**" is a communication link that enables communication. | Stryker: a device for enabling communications between the touchscreen controller and the first and second remotely controllable surgical devices that automatically converts the protocol used by the touchscreen controller into the different protocols used by the first and second remotely controllable surgical devices, and automatically transforms inputs on the touchscreen into control commands for the first and second remotely controllable surgical devices, where the interface was not originally designed to convert the touchscreen controller protocol to the specific protocol used by the |

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

|  | second remotely controllable surgical device (i.e., the third party device), and where the interface connects the touchscreen controller to the first and second remotely controllable surgical devices. |
|--|--|

A person of ordinary skill in the art would understand that an "interface" is a communication link that enables communication.  (G¶86.)  The '539 patent teaches that a master device receives a signal from the touchscreen and distributes the signal to the appropriate surgical device.  This teaching is in accordance with the understanding of one skilled in the art that the interface identified in the claims is a device that enables communication.  By defining interface in this manner, one skilled in the art would understand that the overall claim limitation would not need to be defined further.

Stryker's definition is incorrect for at least the following reasons: (1) it neglects that different language is being construed in claim 18 and claim 27, thereby improperly narrowing the scope of claim 27, (2) it improperly reads the "not originally designed" limitation into the definition, (3) it improperly reads the "automatically" limitation into the definition, (4) its requires that the interface connects the touchscreen controller to the remotely controllable surgical devices.

First, Stryker's definition neglects the difference in the scope of the disputed claim language in claims 18 and 27, and, as a result, improperly narrows the "interface" as used in claim 27.  The term "interface" is positively recited in independent claims 18 and 27, however claim 18 includes additional disputed language not included in claim 27.  Stryker's proposed construction simply ignores these differences, and incorporates the additional disputed limitations of independent claim 18 into its definition of "interface," for claim 27.  For example, Stryker's definition of "interface . . ." (claim 18) requires that the interface "transforms inputs on the touchscreen into commands for the first and second remotely controllable surgical devices."  This limitation is positively recited in claim 18.  (E18 at 11:31-54.)  This limitation, however, is not

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

recited in independent claim 27.  (E19-20 at 12:44-13:5.)  Nonetheless, Stryker's proposed

definition ignores this difference in the plain and ordinary language of independent claims 18 and

27, and therefore improperly reads this limitation into claim 27.  (G¶88.)

Second, Stryker's proposed construction improperly reads the "not originally designed"

limitation into the definition.   (G¶90.)  Stryker's definition requires that the "interface was not

originally designed to convert the touchscreen controller protocol to the specific protocol used by

the second remotely controllable surgical device (i.e, the third party device)."  While such an

interface is *within* the scope of the claims, the definition of "interface . . .," is not *limited* to this.

While the claimed "third party device" is a device not specifically designed to operate

with the communication system, the "interface" is not limited in this way.  In fact, the written

description discloses that is a core objective of the '539 patent to provide a universal

communication system designed to convert the touchscreen controller protocol to the specific

protocol used by the second remotely controllable surgical device.  (G¶91.)  Stryker's improperly

narrow construction completely eviscerates this core objective.  The '539 patent acknowledges

that certain surgical devices are not specifically designed to operate with the universal

communication system.  For example, the '539 patent states that "[d]evices not specifically

designed to operate with a communication system will be referred to herein as third party devices,

whereas devices specifically designed to operate with the communication system will be referred

to herein as, first party devices."  (E13 at 2:54-58.)  The interface of the '539 patent can be

adapted to provide compatibility between the connected devices, regardless of whether or not the

various surgical devices were originally designed to operate with the system.  (E15 at 6:10-16.)

Third, Stryker's definition improperly reads the "automatically" limitation into the

definition. (G¶94.)  Stryker's proposed construction requires "automatic" conversion of protocols

and "automatic" transformation of inputs.  The word "automatically" is not recited in the disputed

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

claim terms.  (E18 at 11:31-54; E18-19 at 12:44-13:5.)  Instead, Stryker is forced to rely on a

portion of the prosecution history, which generally characterizes the invention of the '539 patent

and cited references.  AS previously noted, The prosecution is less useful for claim construction

purposes because it often lacks the clarity of the specification.  *Phillips*, 415 F.3d at 1317.

Stryker supports its narrow construction by arguing that the applicant relied on the automatic

conversion feature.  This argument distorts the prosecution history and illustrates why courts are

reluctant to rely on "arguments" in the prosecution history to narrow claim terms.  S*ee also*

*Omega Eng'g, Inc*, 334 F.3d at 1324 (holding prosecution disclaimer must be unequivocal);  *W.E.*

*Hall Co., Inc*, 370 F.3d at 1352 ("Because [a prosecution history] dialogue is not necessarily

inconsistent with the ordinary meaning of the term, we believe the district court was correct in

using the plain and ordinary meaning.);  *Golight, Inc.*, 355 F.3d at 1332 ("Because the statements

in the prosecution history are subject to multiple reasonable interpretations, they do not constitute

a clear and unmistakable departure from the ordinary meaning of the [disputed] term  . . . .").

        A review of the prosecution history clearly demonstrates that the applicant did not

distinguish the claim invention  based on automatic conversion of protocols and transformation of

inputs. (G¶¶95-96.)  Rather, the applicant distinguished the cited reference by stating "because

[Appelbaum] fails to teach, disclose or suggest the first remotely controllable surgical [sic] is a

first party device and the second remotely controllable surgical device is a third party device, the

second command protocol being different from the first command protocol as required by claims

18 and 27, it cannot anticipate or render these claims obvious."  (F19.)  As a result, the Court

should reject the "automatic" limitation imported by Stryker into the definition of the disputed

claim term.

        Finally, Stryker's construction is improper because it requires that "the interface connects

the touchscreen controller to the first and second remotely controllable surgical devices."  The

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

disputed claim language, however, only requires that the interface is "connected between the touchscreen controller and the first remotely controllable surgical device and the second remotely controllable surgical device[.]"  While claim requires that the interface is connected between the controller and the remotely controllable surgical devices the claim language clearly allows for additional elements to be connected between these devices.  Therefore, the Court should not limit the claims as requested by Stryker.

> **3.**   "**wherein said first remotely controllable surgical is a first party device and said second remotely controllable surgical device is a third party device, the second command protocol being different from the first command protocol.**" (claim 18, 27of the '539 patent)

| KSEA: | STRYKER: |
|---|---|
| **"a first party device"** *means* a device specifically designed to operate with the communication system.<br><br>**"a third party device"** *means* A device not specifically designed to operate with the communication system. | A "first party device" is a device specifically designed to operate with the communication system, i.e. a device specifically designed to communicate using a protocol that the interface was originally and specifically designed to convert to.<br><br>A "third party device" is a device not specifically designed to operate with the communication system, i.e. a device not specifically designed to communicate using a protocol that the interface was originally and specifically designed to convert to. |

The '539 patent explicitly defines a "first party device" as a device "specifically designed to operate with the communication system," and a "third party device" as a device not specifically designed to operate with the communications system.  (E14 at 2:54-58.)  These definitions are binding as a matter of law.  Under the Patent Law, a patentee can act as his own lexicographer by providing a specific definition of a claim term in the written description of the patent.  *See Phillips*, 415 F.3d at 1316 (stating that a patentee may provide a specific definition of a claim term in the written description of the patent).  *Phillips,* 415 F.3d at 1316 (Fed. Cir. 2005).  In such cases, the patentee's definition governs.  *Id.*

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

In this case, the '539 patent sets forth specific definitions for "first party device" and "third party device." These specific definitions control the meaning of the disputed claim terms as a matter of law. In the related case, Smith & Nephew agreed that the patentee's definitions provided in the written description are controlling and jointly submitted this proposed construction to the Court. *KSEA v. Smith & Nephew*, Case 2:07-cv-02702 (Doc. No. 90-1.)

Nonetheless, Stryker disregards this fundamental rule of Patent Law and proposes its own, more narrow definitions, which depart markedly from those set forth in the written description. To its credit, Stryker's definitions incorporate the specific definitions sets forth in the written description. Stryker errs, however, by appending the further limitation that a "first party device" is "specifically designed to communicate using a protocol that the interface was originally and specifically designed to convert to." Stryker further errs by improperly adding the further limitation that a "third party device" is "not specifically designed to communicate using a protocol that the interface was originally and specifically designed to convert to." Further, it is apparent that this is Stryker's second attempt to read this limitation into the claims because this is the same limitation that Stryker is attempting to read into the disputed "interface" limitation discussed above.

## VI.    CONCLUSION.

For the foregoing reasons, KSEA respectfully requests that the Court adopt KSEA's constructions proposed above.

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

1                                 Respectfully Submitted,

2

3    Dated: April 9, 2010                   _____/s/ David W. Aldrich_____

4                                 Justin T. Beck
                                Alfredo A. Bismonte

5                                 Ron C. Finley
                                Jeremy M. Duggan

6                                 BECK, ROSS, BISMONTE & FINLEY, LLP
                                50 West San Fernando Street, Suite 1300

7                                 San Jose, California 95113
                                Tel: (408) 938-7900

8                                 Fax: (408) 938-0790
                                Email: jbeck@beckross.com

9                                             rfinley@beckross.com
                                          abismonte@beckross.com

10                                           jduggan@beckross.com

11                                 Wesley W. Whitmyer
                                David W. Aldrich

12                                 Christopher H. Strate
                                Walter B. Welsh

13                                 ST ONGE STEWARD JOHNSTON & REENS
                                986 Bedford Street

14                                 Stamford, CT 06905
                                Tel: 203-324-6155

15                                 Fax: 203-327-1096

16                                 Email: wwhitmyer@ssjr.com

17                                           daldrich@ssjr.com
                                          cstrate@ssjr.com

18                                           wwelsh@ssjr.com

19                                 Attorneys for Plaintiff,
                                Karl Storz Endoscopy-America, Inc.

20

21                             ATTESTATION

22       As the attorney e-filing this document, I hereby attest that David W. Aldrich, Esq. has

23 concurred in this filing.

24

25    Dated: April 9, 2010                  _____/s/ Alfredo A. Bismonte_____

26

27

28

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900