1
2
3
4
5
6
7
8
9

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KARL STORZ ENDOSCOPY-AMERICA, INC., | No. C 09-00355 WHA |
| Plaintiff, | |
| v. | **CLAIM CONSTRUCTION ORDER** |
| STRYKER CORPORATION and STRYKER COMMUNICATIONS, INC., | |
| Defendants. | |
| _____/ | |
| AND RELATED COUNTERCLAIMS | |
| _____/ | |

**INTRODUCTION**

In this patent infringement action involving surgical equipment management, the parties seek construction of six phrases found in the two asserted patents. On May 3, 2011, a tentative claim construction order was issued, and the parties were invited to file five-page critiques of the constructions therein. After consideration of the supplemental briefing from both sides, final constructions of all six phrases are set forth below.

**STATEMENT**

The traditional approach to surgery required large incisions. A surgeon would cut an opening in the patient's body large enough to access the site of the procedure. The surgeon then performed the operation and viewed the operation site directly through the opening.

United States District Court

For the Northern District of California

Less invasive surgical techniques developed as alternatives to traditional "open" surgery. In particular, advances in endoscopy made "minimally invasive" surgery possible. An endoscope was (and remains) a small instrument with a camera and a light source that could be inserted into the body through a small incision or hole, enabling surgeons to view the inside of a patient's body without opening the body in the traditional manner. Minimally invasive surgery became common, and many surgical instruments were developed for use along with an endoscope in such operations. The technology at issue in this action relates to coordinating the use and control of such instruments.

Three patents were asserted in the operative complaint, but the parties recently stipulated to dismiss one of them (Dkt. Nos. 105, 257). Twenty claims from United States patent No. 5,788,688 and twenty-seven claims from United States patent No. 6,397,286 remain at issue. The parties seek construction of six phrases appearing in these patents. Overviews of the patents, the disputed phrases, and the associated claims are covered in detail in the analysis below.

## ANALYSIS

Courts must determine the meaning of disputed claim terms from the perspective of one of ordinary skill in the pertinent art at the time the patent was filed. *Chamberlain Group, Inc. v. Lear Corp.*, 516 F.3d 1331, 1335 (Fed. Cir. 2008). While claim terms "are generally given their ordinary and customary meaning," the "claims themselves provide substantial guidance as to the meaning of particular claim terms." As such, other claims of the patent can be "valuable sources of enlightenment as to the meaning of a claim term." Critically, a patent's specification "is always highly relevant to the claim construction analysis" as well. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–15 (Fed. Cir. 2005) (en banc) (internal quotations omitted). Indeed, claims "must be read in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Finally, courts also should consider the patent's prosecution history, which "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." These components of the intrinsic record are the primary

United States District Court

For the Northern District of California

1    resources in properly construing claim terms.  Although courts have discretion to consider

2    extrinsic evidence, including dictionaries, scientific treatises, and testimony from experts and

3    inventors, such evidence is "less significant than the intrinsic record in determining the legally

4    operative meaning of claim language."  *Phillips*, 415 F.3d at 1317–18 (internal

5    quotations omitted).

6           Karl Storz Endoscopy-America, Inc. has asserted the same patents that are at issue in this

7    action against a different defendant in the Western District of Tennessee.  Five of the six phrases

8    construed by this order were construed recently in the Tennessee action as well (Dkt. No. 222-1).

9    Stryker Corp. and Stryker Communications, Inc. find the Tennessee court's constructions to be

10   favorable and lean heavily upon them as "confirm[ing] the correctness of Stryker's constructions"

11   (Stryker Br. 1).  While the reasoning of the Tennessee court may be instructive, it is not binding

12   in this action.  This order is required to — and does — undertake a full, independent analysis of

13   each disputed phrase.  *See Aircraft Technical Publishers v. Avantext, Inc.*, No. C 07-4154 (SBA),

14   2009 WL 3817944, at *3 (N.D. Cal. Nov. 10, 2009) (Armstrong, J.) (explaining that each district

15   court "has an independent obligation to construe the claims in dispute, and to render its own

16   independent claim construction").  Moreover, the parties reported at the April 27 hearing that the

17   claim construction rulings from the Tennessee court are only tentative, and that because the

18   Tennessee action is stayed it is unknown when that court will finalize its constructions.

19          While this order acknowledges that the parties have a right to the construction of all

20   disputed claim terms by the time the jury instructions are settled, the Court will reserve the

21   authority, on its own motion, to modify the constructions in this order if further evidence —

22   intrinsic or extrinsic — warrants such a modification.  Given that claim construction is not a

23   purely legal matter, but is (as the Supreme Court describes it) a "mongrel practice" with

24   "evidentiary underpinnings," it is entirely appropriate for the Court to adjust its construction of

25   claims prior to trial if the evidence compels an alternative construction.  *Markman*, 517 U.S.

26   at 378, 390.  The parties should be aware, however, that they are *not* invited to ask for

27   reconsideration of the constructions herein.  Motions for reconsideration may be made only in

28   strict accordance with the rules of procedure, if at all.

**United States District Court**
For the Northern District of California

1.     **THE '688 PATENT**

The '688 patent, entitled "Surgeon's Command and Control," was issued on

August 4, 1998.  Bauer Laboratories, Inc. was the assignee of the '688 patent at the time of issue.

KSEA claims to now own the entire right, title, and interest in this patent (Sec. Amd.

Compl. ¶ 13).  Twenty claims from the '688 patent are asserted in this litigation:  independent

claims 1 and 10, and dependent claims 2–9 and 11–20.  Four of the phrases construed by this

order are found in the '688 patent.  They are italicized in the claims below.

Claim 1 covers the following apparatus (cols. 19:39–20:10):

> 1.     In an endoscopic operating environment defining *a surgeon's operating station at which a surgical procedure is performed* with a plurality of self-contained independently and simultaneously operable pieces of surgical equipment, each including a surgical control head located at a non-sterile area remote from the surgeon's operating station and associated devices developing an output in response to commands manually entered directly at the surgical control head for driving an associated surgical instrument located at the surgeons [*sic*] operating station, a surgeon's command and control system comprising:
>
> > *a surgeon's control panel operatively positioned at the surgeon's operating station*, the surgeon's control panel including display means for displaying data relating to status of each of the plurality of self-contained pieces of surgical equipment and *input means for receiving commands entered manually*;
> >
> > a plurality of communication interface circuits, one for each of said plurality of self-contained pieces of surgical equipment, each for transmitting data representing status of the associated surgical control head and for receiving remote commands for driving the associated self-contained surgical instrument; and
> >
> > a central controller operatively connected to each said communication interface circuit and said surgeon's control panel, said central controller transmitting to said plurality of self-contained pieces of surgical equipment commands entered manually on the surgeon's control panel and transmitting to said surgeon's control panel status of the surgical control heads for display on said display means to provide a surgeon direct command and control of the plurality of self-contained pieces of surgical equipment located in the non-sterile area remote from the surgeon's operating station,

4

*whereby each of the plurality of self-contained pieces of surgical equipment can be simultaneously operated with the operation thereof controlled and monitored from the surgeon's operating station.*

Claims 10 covers a similar apparatus (cols. 20:47–21:19):

> 10.   A surgical control system, comprising:
>
> *a surgeon's operating station at which a surgical procedure is performed*;
>
> first and second self-contained and simultaneously operable pieces of surgical equipment each for performing a surgical procedure and including a surgical control head located at an area remote from the surgeon's operating station and associated devices developing a variable output for driving an associated surgical instrument located at the surgeons [*sic*] operating station, each self-contained piece of surgical equipment including means for producing a signal indicative of the output to each surgical instrument and means for receiving a variable control signal, the output varying in response to variations of the control signal;
>
> first and second communication interface circuits for transmitting data representing status of the surgical control heads and for receiving remote commands for driving each of the self-contained surgical instruments;
>
> *a surgeon's control panel operatively positioned at the surgeon's operating station*, the control panel including a display means for displaying data relating to the output to each of the surgical instruments and *input means for receiving commands entered manually*;
>
> a central controller operatively connected to said communication interface circuits and said surgeon's control panel, said central controller developing and transmitting to each said self-contained piece of surgical equipment the variable control signal from commands entered manually on the surgeon's control panel and transmitting to said surgeon's control panel data relating to the output of each of the surgical instruments for display on said display means to provide a surgeon direct command and control of the self-contained pieces of surgical equipment located in the non-sterile area remote from the surgeon's operating station,
>
> *whereby each of the plurality of self-contained pieces of surgical equipment can be simultaneously operated with the operation thereof controlled and monitored from the surgeon's operating station.*

5

United States District Court

For the Northern District of California

The growing number of advanced instruments required to perform minimally invasive surgery "result[ed] in a tangle of cords and a conglomeration of equipment to be both monitored and controlled during the course of an operation."  The patent further explained:  "What should be a serene environment to promote concentration by the surgeon and the support staff bec[ame] a crowded, disorganized theater with a multitude of buzzers, beeps and flashing lights enveloping the surgical team and patient." (col. 2:1–14).

Each instrument used by the surgeon was connected to a "control head," which "typically include[d] a visual display panel for displaying output parameters of the equipment as well as monitored inputs, and a series of buttons and switches for varying the output which drives the surgical instrument" (col. 1:60–64).  As more and more instruments were relied on in surgical procedures, operating rooms became more and more cluttered with equipment, and the control heads had to be placed further away from the patient and surgeon (col. 2:1–6).  This scattering of equipment required division of the surgeon's attention, and it also limited the surgeon's control over the equipment;  verbal instructions were relayed to support staff who managed the control heads for the surgical instruments.  The surgeon's inability to directly monitor and control the surgical equipment posed safety risks (col. 2:32–47).

The invention disclosed in the '688 patent assuaged these safety risks by consolidating the functions of the various instruments' control heads into one device.  At the technology tutorial, KSEA explained that one of the inventors of the '688 patent, James Bauer, was both a surgeon and a jet pilot.  Bauer observed that the cockpit of an airplane displays status information and provides input controls relating to many different aviation instruments and plane features at once, allowing the pilot to monitor and control many different instruments from the pilot seat.  The invention of the '688 patent provided a similar solution for surgeons.  Figure 1 from the patent depicts a surgeon performing a surgical procedure using a surgical command and control system according to the invention (col. 5:47–79):

United States District Court

For the Northern District of California

Figure 1 from the '688 Patent:
Use of a Surgical Command and Control System



In Figure 1, the surgeon wields several instruments, each of which is connected to a control head. All the control heads are connected to a central equipment control unit (66), which in turn is connected to a surgeon's command and control system (40), with a surgeon's control panel (70) located "proximate the surgeon's operating station" (cols. 6:26–7:37).  Figure 4 depicts the surgeon's control panel in greater detail (col. 5:56–57):

7

United States District Court

For the Northern District of California

Figure 4 from the '688 Patent:
A Surgeon's Control Panel



*Fig. 4*

The surgeon's control panel includes a switch matrix and data display relating to each piece of surgical equipment connected through the command and control system (col. 8:49–52).

### A. "a surgeon's operating station at which a surgical procedure is performed"

The parties dispute the phrase "a surgeon's operating station at which a surgical procedure is performed." The parties interpret the phrase differently, but only Stryker seeks a construction. The parties' proposed constructions are shown below.

| KSEA'S PROPOSED CONSTRUCTION | STRYKER'S PROPOSED CONSTRUCTION |
|---|---|
| "one or more locations within an operating environment at which a member of the surgeon's team controls surgical equipment" | "the place within the sterile field of an operating room where the surgeon and more than one surgical instrument are located for conducting a surgical procedure" |

The construction of this term is relevant to the parties' infringement arguments. The proposed constructions are vastly different. The parties disagree on each of the following points: (1) whether the phrase should be limited to one location as opposed to multiple locations; (2) whether the location(s) referenced depend on the surgeon only as opposed to the surgical team; (3) whether the location(s) are within the sterile field; (4) whether the location(s) include

equipment or instruments; and (5) how many items of equipment or instruments are included. The intrinsic evidence answers all of these questions, but the construction of the disputed phrase need not do so.  The phrase "a surgeon's operating station at which a surgical procedure is performed" is relatively straightforward and could be understood by a juror without much of the additional detail the parties propose to add.

The plain language of the disputed phrase itself indicates that it refers to a single location — "a surgeon's operating station." The noun "station" is singular, not plural.  Thus, "a surgeon's operating station" is a single location.  It is the location "at which a surgical procedure is performed."  The surrounding claim language confirms this interpretation.  Various items are described as being "positioned at the surgeon's operating station," "located at the surgeons [*sic*] operating station," or "located at a non-sterile area remote from the surgeon's operating station" in the asserted claims (*e.g.*, col. 19:44–52).  These descriptions treat the surgeon's operating station as a single location relative to which other locations may be defined.  The specification follows suit, for example describing an area "proximate to a surgeon's operating station" as well as using the locational references already quoted from the claims (col. 1:66).  The disputed phrase refers to a single location.

KSEA's argument to the contrary is unpersuasive.  KSEA focuses on claim language stating that the "surgical procedure" performed at the surgeon's operating station "is performed with a plurality of . . . pieces of surgical equipment" (col. 19:39–42).  Because the equipment includes control heads and other components scattered about the operating room, KSEA would broaden the definition of "a surgeon's operating station" to include any location at which any component of surgical equipment could be controlled (KSEA Br. 5).  This argument fails for several reasons, two of which deserve mention.  *First*, KSEA admits that each piece of surgical equipment includes an instrument to be used in or on the patient (*id.* 4–5).  Because the instrument is part of the piece of equipment, a surgeon could use "a plurality of . . . pieces of surgical equipment" simply by using a plurality of instruments on the patient — without touching any other equipment component located elsewhere.  *Second*, a construction of "surgeon's operating station" that included every location at which a component of surgical equipment is

United States District Court

For the Northern District of California

located would contradict the claim language.  The claim states that the control heads for the pieces of surgical equipment are "located at a non-sterile area *remote from the surgeon's operating station*" (19:44–45) (emphasis added).  Thus, at least the control-head portion of the equipment is located in an area explicitly defined *not* to be part of the surgeon's operating station.

Having determined that the disputed phrase refers to a single location, this order further finds that the location is defined relative to the surgeon.  Again, the plain claim language compels this conclusion, and the specification provides ample support.  The claims specify "*a surgeon's* operating station" (emphasis added), not "a surgical team's operating station."  The specification explains that the invention "unifies the various pieces of equipment currently found in an endoscopic surgical suite into a *surgeon-centered* system (col. 19:32–34) (emphasis added).  Indeed, the invention is called "*surgeon's* command and control," and its goal is "provid[ing] *a surgeon* direct command and control of various surgical equipment devices in an operating room, offering to *the surgeon* heightened situational awareness and command of the surgical procedure" (col. 2:53–57) (emphasis added).  These statements focus on a single surgeon, explaining that the invention consolidates equipment control functions to the location of that surgeon.  The specification contrasts this arrangement with the prior art practice under which "a surgeon cannot efficiently monitor the output settings of the various control units" and "when a surgeon deems an adjustment of the output settings is required, the instructions must be relayed to support staff outside of the sterile field to actually adjust the equipment" (col. 2:32–39).  The point of the invention is bringing all the equipment input and output interfaces to the surgeon who is performing the surgical procedure.

KSEA argues that the term "surgeon's operating station" simply reflects that a surgeon "is in charge" and "does not mean that *only* a surgeon works there" (KSEA Br. 5).  For example, the summary of the invention mentions "allowing the surgeon and assistant to make equipment adjustments," references "[a] team member making device adjustments," and explains that "[t]he surgeon and entire staff is informed of equipment setting changes" (col. 4:42–43, 52, 56–57).  This order recognizes the possibility that other members of the surgical team periodically may perform tasks at the surgeon's operating station.  That observation, however, does not justify a

10

United States District Court

For the Northern District of California

1   finding that the surgeon's operating station encompasses every location ever occupied by a

2   member of the surgeon's team.  On the contrary, the surgeon's operating station is limited to one

3   location, and that location is defined relative to the surgeon.  KSEA cites additional references to

4   teamwork in the detailed description of the invention.  In one possible embodiment, "mounting

5   options provide ready access to the surgical team," and the system generally "provid[es] direct

6   command and control of operating procedures by the surgical team" (cols. 7:35–37).  This

7   language does not address the location of the surgeon's operating station, and the fact that one

8   embodiment may be team-oriented does not limit the scope of the claims.

9          In its critique of the tentative claim construction order, KSEA recasts its argument in

10  slightly different terms.  KSEA reviews favorable evidence from the specification and infers that

11  the applicant used the term "surgeon's" to describe "something used by members of the surgeon's

12  team" (Dkt. No. 292 at 3).  The question at hand is *location*, not use.  Moreover, none of the cited

13  evidence concerning the word "surgeon's" refers to a surgeon's operating station — the phrase

14  being construed.  KSEA's indirect evidence that others may *use* the surgeon's operating station

15  does not contradict the plain claim language defining its location.

16         Turning to the question of whether the surgeon's operating station is located within the

17  sterile field, this order declines to read such a requirement into the disputed phrase at this time,

18  but leaves open the possibility of doing so in the future and the possibility that this will simply be

19  a fact issue for the jury.  After the intrinsic evidence is supplemented with expert testimony at

20  trial, it may become clear that a person of ordinary skill in the art would have understood a

21  surgeon's operating station as something that must be located within a sterile field.  On the

22  present record, however, the undersigned judge is not yet convinced that the disputed phrase

23  should be construed to include a sterility limitation.

24         The phrase itself does not contain any words referring to sterility or non-sterility.  The

25  only information the claims provide about the surgeon's operating station is that it is the location

26  "at which a surgical procedure is performed with a plurality of self-contained independently and

27  simultaneously operable pieces of surgical equipment" (col. 19:40–42).  The only information the

28  claims provide about sterility is that each piece of surgical equipment "includ[es] a surgical

United States District Court

For the Northern District of California

1   control head located at a non-sterile area remote from the surgeon's operating station"

2   (col. 19:43–44).  Contrary to Stryker's arguments, the fact that an area remote from the surgeon's

3   operating station is non-sterile does not imply that the surgeon's operating station is sterile.  The

4   claim language therefore does not support limiting the surgeon's operating station to being

5   contained within a sterile field.

6        The specification also contains no clear indication that the applicants intended to claim

7   such a limitation.  The background section references "the sterile field in which the actual

8   surgical procedure is conducted" and states that "[t]he surgical instruments are positioned within

9   the sterile field proximate to a surgeon's operating station from which the procedure is

10   performed" (col. 1:41–42, 65–67).  The most that can be inferred from these statements is that,

11   under the prior art, the instruments were in the sterile field, and the procedure was performed in

12   the sterile field.  Because the instruments were *proximate to* the surgeon's operating station, and

13   the procedure was performed *from* the surgeon's operating station, the operating station itself was

14   not necessarily included in the sterile field.  Stated in practical terms, the surgeon may have stood

15   in a non-sterile area constituting the surgeon's operating station but reached into the sterile field

16   in order to wield the instruments and perform the procedure.  With two exceptions, all of the

17   specification language Stryker cites follows the language quoted above in that it identifies

18   something other than the surgeon's operating station, but not the surgeon's operating station

19   itself, as being located inside the sterile field (Stryker Br. 11).  Stryker's resort to the prosecution

20   history has the same problem.  Stryker cites a request for reconsideration describing the invention

21   to include "a sterile control panel located *at* the surgeon's operating station" (Bateman Exh. G

22   at 1–2) (emphasis added).  A green car could be parked *at* the library.  That would not mean that

23   the car is *in* the library nor that the library is green.

24        As noted, however, Stryker presents two items of evidence that escape this logical fallacy.

25   This evidence deserves pause.  It does not compel the conclusion that the claimed "surgeon's

26   operating station" must be sterile, but it nonetheless is instructive.  In light of this evidence,

27   this order declines to hold at this time that the surgeon's operating station may include

28   non-sterile portions.

United States District Court
For the Northern District of California

Stryker's first instructive item of evidence comes from the detailed description of the invention.  There, the specification explains that Figure 1 depicts an embodiment in which "[t]he surgeon's operating station 32 is located within a sterile field, shown surrounded in dashed line in FIG. 1" (col. 6:31–33).  This description of a single embodiment, by itself, is not sufficient to justify reading a sterility limitation into the claims.  *Liebel-Flarsheim Co. v. Medrad Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction.").  It does, however, make some progress in that direction.  That the preferred embodiment locates the surgeon's operating station within the sterile field suggests that a person of ordinary skill in the art might recognize the surgeon's operating station as a smaller zone within a larger sterile field.

The second specification statement that weighs in Stryker's favor comes from the background section:  "The surgical team, including surgeons, assistants and supporting nursing staff, must stand within this sterile field and comply with strict 'sterile procedures' to insure that the patient does not become infected as a result of the surgery" (col. 1:42–46).  This statement describes the prior art, and there is no clear indication that it was intended to limit the claimed invention.  On the other hand, however, it describes generally the field within which the invention was made.  A a person of ordinary skill in the art therefore might understand the invention as something to be practiced in a context requiring that the surgeon's operating station be located within a sterile field.

The present record is inconclusive on the question of sterility.  This order will not now read a sterility limitation into the disputed phrase, but it also will not decree that a surgeon's operating station may include non-sterile areas.  For the time being, the question will be left open. This aspect of the construction may be revisited before the jury instructions are finalized.

Stryker, in its critique of the tentative claim construction order, nonetheless urges adoption of a sterility limitation now.  Stryker's insistence does not change the foregoing analysis.  *First*, Stryker's challenges to KSEA's extrinsic evidence regarding remote-control

surgery are irrelevant, because none of the sterility discussion in this order is based on that evidence. *Second*, Stryker's disagreement with the hypothetical description of a small sterile field that extends only a short distance beyond the surgical site is not supported by any evidence. *Third*, Stryker's citation to an online medical dictionary not part of the claim-construction record does not obviate the benefit of awaiting expert testimony. *Fourth*, Stryker's repetition of favorable specification language does not raise new considerations, even though claim terms "are normally used consistently throughout the patent" (Dkt. No. 291 at 1–3). The Court's reasoning as to a possible sterility limitation remains unchanged.

The parties' last disagreement regarding this first disputed phrase addresses the number and location of surgical instruments or pieces of equipment with respect to the surgeon's operating station. On these points the claim language is relatively straightforward and could be understood by a jury without further elaboration. Specifically, the claim language explains that a surgical procedure is performed *at* a surgeon's operating station, that the procedure is performed *with* pieces of surgical equipment, and that each piece of equipment includes a surgical instrument located *at* the surgeon's operating station, as well as other components located elsewhere (col. 19:39–49). The specification language is consistent with these descriptions and further indicates that the instruments are used to deliver physical effects to the patient (*e.g.*, col. 1:37–38). The parties' attempts to define the location of the surgeon's operating station relative to the surgical equipment or instruments strain beyond the scope of the disputed phrase and contradict the claim language. They are accordingly rejected.

In light of the foregoing, the phrase "a surgeon's operating station at which a surgical procedure is performed" shall be construed to mean "the location a surgeon occupies while using surgical instruments to perform a surgical procedure on a patient," at least for th time being.[1]

---

[1]The Tennessee court construed "surgeon's operating station" as the "place within the sterile area of the operating environment where the surgeon and the surgical instruments are located during a surgical procedure" (Dkt. No. 222-1 at 11). Unlike the Tennessee construction, this order does not require the surgeon's operating station to be located within the sterile field and does not incorporate the presence of surgical instruments into the construction. Although this order declines to read a sterility limitation into the disputed phrase at this time, it does not foreclose the possibility of doing so in the future and it does not hold that a surgeon's operating station may include non-sterile areas.

United States District Court

For the Northern District of California

**B.    "a surgeon's control panel operatively positioned
at the surgeon's operating station"**

The parties dispute the phrase "a surgeon's control panel operatively positioned at the
surgeon's operating station."  Again, they interpret the phrase differently, but only Stryker seeks a
construction.  The parties' proposed constructions are shown below.

| KSEA'S PROPOSED CONSTRUCTION | STRYKER'S PROPOSED CONSTRUCTION |
| --- | --- |
| " a control panel operable from the surgeon's operating station" | "a panel for the surgeon that is positioned within the sterile field such that the surgeon can directly operate the panel from the surgeon's operating station by manually entering commands on the panel and by directly viewing data displays on the panel" |

The parties' main dispute regarding this phrase is whether the control panel must be within the
sterile field, *i.e.*, sterile.  They also dispute whether "operatively positioned at the surgeon's
operating station" refers to certain uses by the surgeon.  The construction of this phrase is relevant
to the parties' infringement arguments.

This order finds that "a surgeon's control panel" need not be sterile, sterilized, or within
the sterile field.  The plain language of independent claims 1 and 10 simply does not include any
such requirement.  Dependent claims 9 and 18, on the other hand, *add* the limitation "wherein
said control panel comprises a control panel that is sterilized to avoid transfer of microorganisms
from the control panel to a user" (cols. 20:44–46, 22:10–13).  The doctrine of claim
differentiation thus requires the inference that the "surgeon's control panel" disclosed in claims 1
and 10 is *not* sterilized.  *Phillips*, 415 F.3d at 1315 ("[A] dependent claim that adds a particular
limitation gives rise to a presumption that the limitation in question is not present in the
independent claim.").

Stryker nonetheless attempts to split hairs, arguing that the term "sterilized" in the
dependent claims refers only to a particular process for making an object sterile.  According to
Stryker, the control panel of claim 1 could be "sterile" and "within the sterile field" without
having been "sterilized" because "claim 1 allows the panel to be protected in other ways, such as

United States District Court

For the Northern District of California

covering it with a surgical drape" (Stryker Resp. Br. 12).  Stryker's attempt to distinguish

between "sterile" and "sterilized" runs afoul of the prosecution history.  In response to the

rejection of claim 9 as indefinite, the applicants stated that claim 9 "depends from claim 1 and . . .

further adds the limitation that the panel is a *sterile* control panel" (Bateman Exh. G at 2)

(emphasis added).  Thus, the applicants used the terms "sterile" and "sterilized" interchangeably,

and characterized the control panel in dependent claim 9 as differing from the control panel in

independent claim 1 in that the former must be "sterile."

Accordingly, the "surgeon's control panel" of the independent claims need not be sterile

and need not be within the sterile field as Stryker suggests.  The drawings and specification

describe a preferred embodiment of the invention in which the control panel is a "sterile control

panel" (*e.g.*, col. 8:49–50).  The observation that the panel *may* be sterile, however, does not

mean that the panel *must* be sterile in order to practice the claimed invention.  In light of the

foregoing discussion of the claims themselves, a sterility limitation will not be read from the

specification into the disputed phrase.

Turning to the second part of the disputed phrase, the parties disagree whether

"operatively positioned at the surgeon's operating station" requires that the surgeon be able to use

the control panel in certain ways.  As discussed with respect to the "surgeon's operating station"

phrase construed above, the goal of the invention is to provide a surgeon direct command and

control of the surgical equipment from his or her operating station.  The claim language itself

repeats that the purpose of the input and output means on the surgeon's control panel is "to

*provide a surgeon direct command and control* of the plurality of self-contained pieces of surgical

equipment located in the non-sterile area remote from the surgeon's operating station"

(col. 20:3–6) (emphasis added).  *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1160

(Fed. Cir. 1997) ("In construing claims, the problem the inventor was attempting to solve, as

discerned from the specification and the prosecution history, is a relevant consideration.").

The phrase "operatively positioned at the surgeon's operating station" serves this goal by

locating the control panel close enough to the surgeon that the surgeon can use it without leaving

his or her operating station.  *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,

United States District Court

For the Northern District of California

424 F.3d 1293, 1306 (Fed. Cir. 2005) (noting that the term "operatively" is used to describe the functional relationship between claimed components). KSEA argues that other members of the surgical team besides the surgeon may operate the surgeon's command and control panel, citing specification language that references a broader goal of "providing direct command and control of operating procedures by the surgical team" (col. 6:43–44). That may be so, but it does not change the foregoing analysis. The crucial requirement is that the surgeon's control panel must be positioned such that the surgeon *can* use it directly from his or her operating station. The observation that other members of the surgical team also may use the control panel is irrelevant. KSEA's critique of the tentative construction, which was discussed above with reference to the location of the surgeon's operating station, seems to have missed this point.

The claim language describes the surgeon's control panel has having two types of functionality: (1) a "display means for displaying data relating to status of each of the plurality of self-contained pieces of surgical equipment," and (2) an "input means for receiving commands entered manually" (col. 19:51–56). The specification matches this description. Thus, the direct use or operation of the surgeon's control panel would require (1) viewing the data displayed on the display means, and (2) manually entering commands through the input means. A control panel "operatively positioned at the surgeon's operating station" such that the surgeon is able to make full use of the control panel would have to be close enough to the surgeon to enable the surgeon to perform both of those functions without leaving his or her operating station.

Based on the foregoing considerations, the phrase "a surgeon's control panel operatively positioned at the surgeon's operating station." shall be construed to mean "a panel that a surgeon can use directly both to view data and to enter commands manually without leaving the surgeon's operating station."[2]

---

[2]The Tennessee court construed "operatively positioned at the surgeon's operating station" as "positioned at the surgeon's operating station within reach and view of the surgeon to allow control and monitoring of the pieces of surgical equipment" (Dkt. No. 222-1 at 14). The construction adopted by this order is not meaningfully different.

**United States District Court**
For the Northern District of California

C.      **"input means for receiving commands entered manually"**

The parties dispute the means-plus-function limitation "input means for receiving commands entered manually."  The parties' proposed constructions are shown below.

| KSEA'S PROPOSED CONSTRUCTION | STRYKER'S PROPOSED CONSTRUCTION |
|---|---|
| "a switch matrix, and equivalents thereof, for receiving commands entered manually" | "a membrane switch with a switch matrix, the switch matrix being associated with a number of raised switches, buttons or keys that can be depressed by the surgeon" |

The construction of this phrase is relevant to the parties' infringement arguments;  Stryker seeks to lard up the construction with requirements that would exclude its accused products.  For example, Stryker's proposed construction requires "raised switches, buttons or keys that can be depressed," whereas their accused products employ smooth touch-screen panels without any such raised switches, buttons, or keys.  Stryker, however, fails to provide adequate support for reading any of the detailed requirements it proposes into the patent claims.

Means-plus-function claim limitations are "construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof" for performing the recited function. 35 U.S.C. 112 ¶ 6.  To construe such a limitation, a court first must identify the claimed function and then must identify the recited structure in the specification that is capable of performing the recited function.  A means-plus-function claim limitation does not include elements that are not necessary for performing the recited function.  *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

Here, the parties agree that the claimed function is "receiving commands entered manually."  With respect to identifying the structure that corresponds to this function, however, the parties' views diverge.  KSEA points to "a switch matrix," whereas Stryker identifies "a membrane switch with a switch matrix" and additionally would require the switch matrix to be "associated with a number of raised switches, buttons or keys that can be depressed by the surgeon."  KSEA has the better arguments.

18

The claims themselves do not specify a structure for "receiving commands entered manually." The specification must be consulted. The detailed description of the invention describes two features of the surgeon's control panel: "a switch matrix" and "panel displays" (col. 8:51–52). As explained in construing the "surgeon's control panel" phrase above, the surgeon's control panel has two types of functionality. The two panel features map onto the two panel functions: the switch matrix performs the function of "receiving commands entered manually," and the panel displays perform the function of "displaying data." No other structure besides the switch matrix is disclosed for performing the function of receiving commands entered manually.

Stryker's attempts to deviate from this analysis are misguided. *First*, Stryker identifies "a membrane switch with a switch matrix" rather than simply "a switch matrix" as the structure corresponding to the function of receiving commands. The specification describes membrane technology as a way to produce a sealed unit that can undergo sterilization (cols. 8:67–9:3). This function has nothing to do with "receiving commands." Membrane technology does not belong in the construction of the disputed term. Further, the construction "a switch with a switch matrix" is nonsensical in the context of the '688 patent. Stryker cites a portion of the specification stating that "[a] membrane switch and display panel 124 includes the switch matrix 112 and displays 114" (col. 8:65–67). Thus, a membrane switch-and-display *panel* includes both (1) a switch matrix, and (2) displays. It is the panel, not a "membrane switch," that includes the switch matrix. Stryker's construction contradicts the grammar of this sentence and describes a switch that itself includes a matrix of other switches — something that the claims and specification of the '688 patent neither disclose nor require.

*Second*, Stryker attempts to add the requirement of "a number of raised switches, buttons or keys that can be depressed by the surgeon." Stryker emphasizes that the specification only discloses embodiments of the invention that use such raised devices to receive manually-entered commands (Stryker Br. 16). There is, however, no indication that such raised devices are the *only* way a switch matrix could be operated. Indeed, the Federal Circuit has cautioned district courts against inferring unstated claim requirements from the fact that only one type of embodiment is

United States District Court
For the Northern District of California

1  disclosed in the specification. *Liebel-Flarsheim*, 358 F.3d at 906. The '688 patent teaches that

2  the only structure needed for receiving commands is "a switch matrix," which *may* be embodied

3  with raised buttons. Stryker's transparent attempt to escape infringement by reading a raised-

4  button requirement into the claims is not supported by the specification.

5       KSEA's proposed construction will be adopted, because it accurately applies the

6  governing law to the intrinsic evidence. Accordingly, the phrase "input means for receiving

7  commands entered manually" shall be construed to mean "a switch matrix, and equivalents

8  thereof, for receiving commands entered manually."[3]

9       **D.    "whereby each of the plurality of self-contained pieces of surgical**
           **equipment can be simultaneously operated with the operation thereof**
10          **controlled and monitored from the surgeon's operating station"**

11      The parties dispute the phrase "whereby each of the plurality of self-contained pieces of

12  surgical equipment can be simultaneously operated with the operation thereof controlled and

13  monitored from the surgeon's operating station." The parties interpret the phrase differently, but

14  only Stryker seeks a construction. The parties' proposed constructions are shown below.

| KSEA'S PROPOSED CONSTRUCTION | STRYKER'S PROPOSED CONSTRUCTION |
|---|---|
| "(1) each of the two or more self-contained pieces of surgical equipment can be operated at the same time, and (2) the operation of a self-contained piece of surgical equipment can be controlled and monitored from the surgeon's operation station" | "each piece of self-contained surgical equipment can be controlled and monitored at the same time from the surgeon's operating station through the surgeon's control panel" |

21  The construction of this phrase is relevant both to the parties' infringement arguments and to their

22  invalidity arguments. The parties' main dispute concerns whether the phrase requires the

23  capacity to control and monitor multiple pieces of equipment at once. The touch-screen panels on

24  Stryker's accused products display data and controls for only one piece of equipment at a time, so

25  an affirmative answer to this question would help Stryker escape a finding of infringement

---

27  [3]The Tennessee court construed "input means" as disclosing a "switch matrix associated with a number
28  of physically manipulable switches, keys or buttons for receiving manually entered commands, which performs
     the function of receiving commands entered manually" (Dkt. No. 222-1 at 23). This order agrees that the
     relevant function is receiving commands entered manually and that the corresponding structure is a switch
     matrix, but the construction adopted here does not require physically manipulable switches, keys, or buttons.

United States District Court

For the Northern District of California

(Stryker Br. 10). Additionally, the parties dispute whether the control and monitoring must be done through the surgeon's control panel.

Turning first to the question whether the control and monitoring must be done through the surgeon's control panel, this order declines to add Stryker's proposed limitation. Claim 1 was drafted to disclose "a surgeon's command and control system comprising: a surgeon's control panel . . . ; a plurality of communication interface circuits . . . ; and a central controller . . . , whereby each of the plurality of self-contained pieces of surgical equipment can be simultaneously operated with the operation thereof controlled and monitored . . ." (cols. 19:49–20:9). Claim 10 has a similar structure. Thus, the "whereby" clause refers to "a surgeon's command and control system," which is made up of a control panel, communication interface circuits, and a central controller. The entire *command and control system* is what makes the monitoring and control in the "whereby" clause possible. Limiting that monitoring and control to the surgeon's control panel, which is only one of three components of the command and control system, would be improper.

Stryker emphasizes the claim language "controlled and monitored from the surgeon's operating station" and argues that the "surgeon's control panel operatively positioned at the surgeon's operating station" is the only recited element that a surgeon could use to control and monitor the equipment "*from* the surgeon's operating station" (Stryker Br. 7). This order partially agrees. The control panel is the only element that the surgeon would use *directly*, but the surgeon would be relying on the entire command and control system (including the communication interface circuits and central controller as well as the control panel) in order to control and monitor the surgical equipment from the surgeon's operating station. The fact that the control panel is the only element the surgeon would use *directly* is irrelevant to the disputed phrase and would add confusion rather than clarity to its construction.

Turning next to the question of simultaneous control and monitoring, Stryker's position fares somewhat better. The words "with the operation thereof" are at the heart of the parties' dispute about this aspect of the phrase. Each of these words merits close attention. *First*, the word "with" is significant. KSEA reads the disputed phrase to set forth two "independent"

1   requirements.  Not so.  The word "with" connects the first and section portions of the phrase by

2   grouping them together into a joint requirement rather than two independent ones.  This order,

3   however, does not go so far as to agree with Stryker that "with" translates  to "at the same time."

4   *Second*, the words "the operation" refer to the simultaneous operation described in the first part of

5   the phrase.  The adverb "simultaneously" modifies the verb "operated," and there is no other

6   antecedent operation.  *Third*, the word "thereof" refers to "each of the plurality of self-contained

7   pieces of surgical equipment."  The simultaneous operation is *of* "each of the . . . pieces of

8   surgical equipment."  Thus, the disputed phrase refers to the monitoring and control of the

9   simultaneous operation of multiple pieces of surgical equipment.

10      Stryker cites the prosecution history of the '688 patent to support its argument that the

11   *simultaneous control and monitoring* of multiple items of equipment (as opposed to the control

12   and monitoring of *simultaneous operation* of the equipment) is required (Stryker Br. 8–9).

13   Stryker first relies on the applicants' statement that "a good portion of the application is directed

14   to the ability of a surgeon to simultaneously control and monitor multiple self-contained pieces of

15   surgical equipment from a central location" (Bateman Exh. E at 7).  This statement is too general

16   to override the foregoing analysis of the specific claim language.  In its critique of the tentative

17   claim construction, Stryker offers its "opinion" that this statement should not be dismissed so

18   easily (Dkt. No. 291 at 3).  "The purpose of consulting the prosecution history in construing a

19   claim is to exclude any interpretation that was disclaimed during prosecution."  *Chimie v. PPG*

20   *Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005).  The statement in question is not such a clear

21   disclaimer.  The claim language is unambiguous, and the applicant's intent concerning "a good

22   portion of the application" is too vague to displace the specific claim language being construed.

23      Stryker also notes that the disputed phrase was added by amendment after claim 1 was

24   rejected as anticipated by a prior art reference (*see* Bateman Exh. C–E; Aldrich Exh. H).  Stryker,

25   however, cites no evidence that *simultaneous control and monitoring* of equipment (as opposed to

26   control and monitoring of *simultaneous operation* of the equipment) was understood by the

27   examiner or the applicants as a distinguishing feature of the invention.  As explained, the

28

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1    language of the disputed phrase itself does not support such an inference absent an explicit

2    statement to that effect in the prosecution history.  No such evidence exists.

3           KSEA explains that "for the embodiments disclosed in the '688 patent, it is impossible to

4    control the operation of two or more pieces of surgical equipment at the exact same time from the

5    surgeon's control panel because the control panel can only receive one command at a time, and

6    because the serial communication link between the control panel and the central controller can

7    only transmit one command at a time" (KSEA Br. 16).  Stryker does not contest this statement.

8    Instead, Stryker construes its own proposed construction to mean that the data and controls for all

9    of the pieces of surgical equipment are "present and available to the surgeon at the same time on

10   the surgeon's control panel" even if they cannot all be operated at exactly the same time

11   (Stryker Br. 9).  To the extent these arguments apply to the reasoning adopted herein, this order

12   recognizes that the disclosed invention can process only one command at a time.  This

13   recognition, however, was not a basis for rejecting Stryker's proposed construction as Stryker

14   speculated in its critique (Dkt. No. 291 at 3–4).  Rather, it was noted to clarify that the use of the

15   phrase "simultaneous operation" in the construction is informed by this practical reality.

16          The phrase "whereby each of the plurality of self-contained pieces of surgical equipment

17   can be simultaneously operated with the operation thereof controlled and monitored from the

18   surgeon's operating station" shall be construed to mean "whereby the simultaneous operation of

19   multiple pieces of surgical equipment can be monitored and controlled from the surgeon's

20   operating station."[4]

21          **2.      THE '286 PATENT**

22          The '286 patent, entitled "Arrangement for the Central Monitoring and/or Control of At

23   Least One Apparatus," was issued on May 28, 2002.  Storz Endoskop GmbH was the assignee of

24   the '286 patent at the time of issue.  KSEA claims to now own the entire right, title, and interest

25   in this patent (Sec. Amd. Compl. ¶ 17).  Twenty-seven claims from the '286 patent are asserted in

26

27          [4]The Tennessee court construed "can be simultaneously operated" as meaning that "all of the surgical
     equipment can be controlled and monitored at the same time from the surgeon's control panel" (Dkt. No. 222-1
28   at 18).  This order explicitly does not equate operation with control and monitoring, and the construction
     adopted here does not incorporate reference to the surgeon's control panel.

this litigation:  independent claim 1, and dependent claims 3–4, 7–11, 13, 19–20, 22, 24–28, 30–33, and 35–40.  Two of the terms construed by this order are found in the '286 patent.  They are italicized in the claim below.

Claim 1 covers (col. 7:8–20):

> 1.    System for centrally controlling a plurality of instruments for endoscopy characterized by:
>
> > a *self-configuring bus* and a bus master and a plurality of interfaces interconnecting the instruments to the *self-configuring bus*;
> >
> > the instruments being operatively connected via interfaces on the *self-configuring bus* to said bus master,
> >
> > the bus master monitoring communication on the bus for correct execution;
> >
> > the bus master configuring the bus automatically *whenever a said instrument is either newly connected or is disconnected from said bus without interruption of the operation of the system.*

The '286 patent provides a computer science solution relevant to implementing a system like the one disclosed in the '688 patent.  The invention "is based on the problem of improving a system for centrally monitoring and/or controlling at least one unit for endoscopy, and specifically for minimally invasive surgery" (cols. 1:66–2:2).  The invention does so "in such a way that a large number of (different or identical) units can be centrally controlled at a comparatively low expenditure" and "with the replacement of failed units or the connection of new units being possible during the ongoing operation without any problems and particularly without interference with the other units" (col. 2:3–9).

United States District Court

For the Northern District of California

### A.      "self-configuring bus"

The parties dispute the term "self-configuring bus."  The parties' proposed constructions are shown below.

| KSEA's PROPOSED CONSTRUCTION | STRYKER's PROPOSED CONSTRUCTION |
|---|---|
| "a communication network in which at least two connected devices automatically communicate with each other" | "a communication medium that can be shared by more than two devices and that automatically selects which device on the bus will serve as the bus master" |

The parties dispute whether a bus is a "communication network" or a "communication medium," but KSEA abandons this dispute in its responsive brief, conceding that "[t]he term 'bus' . . . can be understood to mean a medium . . ." (KSEA Resp. Br. 12).  The remaining disputes concern how many devices must be connected to the bus and what constitutes self-configuration.

Regarding the number of devices, the claim language refers to "a plurality of interfaces interconnecting the instruments to the self-configuring bus" (col. 7:10–12).  The instruments, in turn, are "a plurality of instruments for endoscopy" (col. 7:8–9).  Thus, the bus claimed by the patent interconnects "a plurality" of devices.  That means more than one.

Stryker argues that, instead, the bus must be capable of being shared by *more than two* devices.  Stryker's arguments are unpersuasive.  *First*, Stryker argues that the claim requires a bus master *and* a plurality of instruments, which would add up to at least three devices (Stryker Br. 22).  This argument fails because the bus master could be one of the plurality of instruments.  The claim does not enumerate the bus master and the plurality of instruments as separate, mutually-exclusive elements, and the specification explains that any of a variety of devices may serve as bus master in addition to performing its own function (cols. 3:15–32, 6:9–22).  A dedicated bus master is not required.

In its critique of the tentative construction, Stryker responds that the question whether the bus master can be an instrument "is independent of" the question whether the bus master can be one of the plurality of instruments *recited* in claim 1.  Stryker cites the limitation "the instruments being operatively connected via interfaces on the self-configuring bus to said bus master"

25

United States District Court
For the Northern District of California

1  (col. 7:13–14) to argue that the instruments and the bus master are separate elements in claim 1

2  (Dkt. No. 291 at 5).  Adopting this interpretation of the claim language, however, still would not

3  justify adopting Stryker's ultimate construction.  The parties framed their dispute as concerning

4  the minimum number of devices that must share or communicate with each other through the bus.

5  If the bus master of claim 1 is construed as something different from the instruments

6  interconnected to the bus, then claim 1 only would require the bus master to *configure* the bus and

7  to *monitor* communication on the bus — not to use the bus for communicating with other devices

8  (col. 7:8–20).  Thus, the bus master would not count as an additional device sharing or

9  communicating through the bus with other devices.

10      *Second*, Stryker cites the specification for support, arguing that "[b]y disparaging systems

11  with a number of point-to-point serial or parallel 'computer interfaces,' the '286 patent

12  distinguishes the claimed 'bus' from a collection of one or more point-to-point connections where

13  the various connections are not shared by more than two devices — i.e., where data sent over one

14  point-to-point link is not necessarily sent over any other point-to-point link" (Stryker Br. 21)

15  (citation omitted).  This argument is too attenuated to overcome the use of the word "plurality" in

16  the claim itself.  The specification language Stryker cites merely states that "[t]he use of serial or

17  parallel interfaces for controlling the devises presents the disadvantage that the number of the

18  total units which can be controlled by the master computer is restricted by the number of

19  computer interfaces" (col. 1:35–38).  This observation about the prior art does not indicate that

20  the claims are limited to buses that can connect more than two devices.

21      *Third*, Stryker cites the prosecution history of the '286 patent, arguing that in

22  distinguishing prior art, "the Applicant also disclaimed any interpretation of the claims that

23  allows the 'bus' to be either:  (1) a single, point-to-point connection between two devices; or

24  (2) multiple point-to-point connections between various devices where those multiple connections

25  are not shared by all of those devices" (Stryker Br. 21).  This, too, is a stretch.  The portion of the

26  prosecution history that Stryker cites for support enumerates several respects in which the

27  claimed invention differs from the prior art reference.  The number of devices connected by the

28  bus is not one of them (Bateman Exh. L at 8).  There was no clear disavowal of claim scope

26

United States District Court

For the Northern District of California

1    limiting the claimed bus to being capable of connecting more than two devices. *See Teleflex, Inc.*

2    *v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002).

3            Turning to the question of self-configuration, neither the claim language nor the

4    specification provides much elaboration.  The most that can be inferred from the phrase "self-

5    configuring bus" is that the bus configures itself if some way, such that external configuration

6    which otherwise would be necessary is not required.  The parties agree that the self-configuration

7    happens "automatically."  The intrinsic record of the '286 patent uses the term of art "configure"

8    without providing any clue as to its definition, so further construing that term of the disputed

9    phrase would require a resort to extrinsic evidence.  *Vitronics Corp. v. Conceptronic, Inc.*,

10   90 F.3d 1576, 1583 (Fed. Cir. 1996).  None, however, was provided.  In its critique of the

11   tentative construction, Stryker states that "both parties agree the term [configuration] needs

12   construing" and that "it is for the Court to try to resolve, if it can, this dispute between the parties"

13   (Dkt. No. 291 at 4).  KSEA's critique of the tentative construction did not address this term, so it

14   is *not* clear that KSEA agrees that the term "configuration" needs further construing.  Moreover,

15   the claim-construction record does not include extrinsic evidence showing how the term was

16   understood by those of ordinary skill in the art.  Having foregone the opportunity to provide this

17   necessary foundation for construing the term, Stryker may not now demand a construction, at

18   least on this record.

19           Stryker argues that the claimed self-configuration is the process by which the bus selects

20   which device on the bus will serve as the bus master.  Stryker reasons that this process is the only

21   process disclosed in the patent that would constitute self-configuration by the bus

22   (Stryker Br. 24–25).  The problem with Stryker's argument is that claim 1 does not disclose this

23   process as part of the invention.  Selection of the bus master is disclosed in dependent claims, but

24   it is not required by the independent claim.  The specification further explains that the bus-master

25   selection process becomes relevant only when "more than one unit suitable for use as BUS master

26   is connected to the bus," and even then it is only "preferable" — not required — that provisions

27   "be made for arbitration or assignment of priorities so as to ensure that only one BUS master

28

27

United States District Court
For the Northern District of California

1  assumes the active BUS master function" (col. 3:28–32).  This feature may not be read into the

2  independent claim simply because it is included in a preferred embodiment.

3      Because of the dearth of intrinsic evidence as to the meaning of "configure," the phrase "a

4  self-configuring bus" shall be construed simply to mean "a communication medium for

5  connecting multiple devices that automatically configures itself."[5]  This construction, which has

6  been refined since the May 3 tentative construction was issued, recognizes and allows for the fact

7  that the bus is configured automatically by the bus master whenever an instrument is either newly

8  connected or is disconnected from the bus, as required by the claim language.

9  **B.**  **"whenever a said instrument is either newly connected or is**
       **disconnected from said bus without interruption of the**
10      **operation of the system"**

11     The parties dispute the phrase "whenever a said instrument is either newly connected or is

12  disconnected from said bus without interruption of the operation of the system."  The parties

13  interpret the phrase differently, but only Stryker seeks a construction.  The parties' proposed

14  constructions are shown below:

| KSEA'S PROPOSED CONSTRUCTION | STRYKER'S PROPOSED CONSTRUCTION |
|---|---|
| "whenever an instrument is either newly connected or is disconnected from the bus without interruption of the operation of the system" (no construction) | "whenever an instrument and the interface that directly links it to the bus are either newly connected to or disconnected from the bus without interruption of the operation of the system, where the bus is a communication medium that can be shared by more than two devices" |

21  The construction of this phrase is relevant to the parties' infringement and invalidity arguments.

22  Stryker's proposed construction of incorporates its proposed construction of "self-configuring

23  bus."  Because the phrase "self-configuring bus" already was construed, Stryker's arguments on

24  that portion of this phrase need not be addressed again here.  Thus, the only dispute to be settled

26     [5]The Tennessee court construed "self-configuring bus" as a "shared communication medium
27  connecting multiple stations (*e.g.*, instruments) that has functionality for (I) automatically, based on arbitration provisions or assigned priorities, determining which one of the stations will serve as the bus master, and (ii)
28  automatically detecting the connection or disconnection of stations to or from the bus" (Dkt. No. 222-1 at 31).
   This order agrees that a self-configuring bus is a communication medium for connecting multiple devices, but it does not attribute any such specific functionality to the bus.

United States District Court

For the Northern District of California

1    is whether an instrument connected to the bus and the interface that directly links it to the bus

2    must be unplugged or plugged back in together, as a single unit.

3         The claim language describes instruments that are connected to the bus through interfaces.

4    Thus, the connection of an instrument to the bus could be disrupted by breaking the bus/interface

5    joint, or the interface/instrument joint, or both.  This observation suggests that the phrase

6    "whenever a said instrument is either newly connected or is disconnected from said bus" would

7    encompass disconnection and re-connection at either of those joints.

8         Stryker construes the phrase to refer only to disconnection and re-connection at the

9    interface/bus joint.  Stryker's arguments are not persuasive.  *First*, Stryker notes that "only the

10   'interface' directly connects to the bus" and infers from that fact that "claim 1 must be referring to

11   connecting or disconnecting an instrument's interface when it refers to the connection or

12   disconnection of an 'instrument' from the bus" (Stryker Br. 18).  The foregoing analysis of the

13   claim language refutes this argument.

14        *Second*, Stryker argues that the specification supports its construction because "[e]very

15   embodiment shown in the '286 patent shows the interface of the instrument as being directly

16   linked to the bus" and because "the specification disparages point-to-point 'serial or parallel

17   interfaces' when describing the prior art" (Stryker Br. 20).  As explained, the mere presence or

18   use of an interface layer is not enough to support Stryker's construction.

19        *Third*, Stryker also relies on the prosecution history of the '286 patent, arguing that the

20   applicants distinguished prior art on the ground that it allowed adapters (which Stryker analogizes

21   to the claimed interfaces) to be connected or disconnected from a bus only when there was no bus

22   power.  Based on this characterization of the applicants' revisions and remarks, Stryker concludes

23   that the claims of the '286 patent "only include systems that, in addition to meeting the other

24   claim limitations, allow the instrument and the interface that directly links the instrument to the

25   bus to be connected to or disconnected from the bus without interrupting operation of the system"

26   (Stryker Br. 19–21).  Without commenting on the accuracy of Stryker's interpretation of the

27   prosecution history, this order finds Stryker's conclusion therefrom inadequate to support

28   Stryker's proposed construction.  The observation that the claimed invention *allows*

United States District Court
For the Northern District of California

1 | disconnection at the interface/bus joint does not imply a *requirement* that the invention

2 | accommodates disconnection *only* at that joint.

3 |      The phrase "whenever a said instrument is either newly connected or is disconnected from

4 | said bus without interruption of the operation of the system" shall be construed to mean

5 | "whenever an instrument-interface unit is newly connected or disconnected from the bus, or an

6 | instrument is newly connected or disconnected from an interface connected to the bus, without

7 | interruption of the operation of the system."[6]

8 | **CONCLUSION**

9 |      For the reasons provided herein, the constructions set forth above will apply in this action.

10 | The Court reserves the authority, on its own motion, to modify these constructions if further

11 | evidence warrants such a modification.  Counsel, however, may not ask for modification.

13 |      **IT IS SO ORDERED.**

15 | Dated:  May 12, 2011.

16 | WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[6]The Tennessee court did not construe any portion of this disputed phrase (Dkt. No. 222-1 at 26–35).

30